Exhibit 4

# AGREEMENT

## BETWEEN
## THE CIVIL SERVICE
## EMPLOYEES ASSOCIATION, INC.
### and
## THE STATE OF NEW YORK

# Administrative
# Services Unit





487-M

## 2007-2011

P 003008

## ADMINISTRATIVE SERVICES UNIT
## AGREEMENT

Agreement made by and between the Executive Branch of the State of New York (the "State") and The Civil Service Employees Association, Inc. ("CSEA").

## ARTICLE 1
## Recognition

The State, pursuant to the certification of the Public Employment Relations Board, recognizes CSEA as the exclusive representative for collective negotiations with respect to salaries, wages, hours and other terms and conditions of employment of employees serving in positions in the Administrative Services Unit and similar positions hereafter created.  The terms "employee" or "employees" as used in this Agreement shall mean only employees serving in positions in such unit and shall include seasonal employees where so specified.

## ARTICLE 2
## Statement of Policy and Purpose

§2.1  It is the policy of the State to continue harmonious and cooperative relationships with its employees and to ensure the orderly and uninterrupted operations of government.  This policy is effectuated by the provisions of the Public Employees' Fair Employment Act granting public employees the rights of organization and collective representation concerning the determination of the terms and conditions of their employment.

§2.2  The State and CSEA now desire to enter into an agreement reached through collective negotiations which will have for its purposes, among others, the following:

(a) To recognize the legitimate interests of the employees of the State to participate through collective negotiations in the determination of the terms and conditions of their employment.

(b) To promote fair and reasonable working conditions.

(c) To promote individual efficiency and service to the citizens of the State.

P 003015

### §8.6 Relocation Expenses

During the term of this Agreement, employees in CSEA negotiating units who qualify for reimbursement for travel and moving expenses upon transfer, reassignment or promotion (under Section 202 of the State Finance Law and the regulations thereunder) or for reimbursement for travel and moving expenses upon initial appointment to State service (under Section 204 of the State Finance Law and the regulations thereunder) shall be entitled to payment at the rates provided in the Rules of the Director of the Budget 9 NYCRR Part 155.

## ARTICLE 9
## Health Insurance

**§9.1** (a) The State shall continue to provide all the forms and extent of coverage as defined by the contracts in force on March 31, 2007 with the State's health insurance carriers unless specifically modified by this Agreement.

(b) The State shall provide toll-free telephone service at the Department of Civil Service Health Insurance Section for information and assistance to employees and dependents on health insurance matters.

### §9.2 Empire Plan Hospitalization
### 1. Network Coverage

(a) Covered inpatient services received at a network hospital will be paid-in-full. Covered outpatient services (outpatient lab, x-ray, etc. and emergency room) received at a network hospital will be subject to the appropriate copayment.

(b) The copayment for emergency room services will be $50. Effective January 1, 2010, the copayment for emergency room services will increase to $60. Charges for outpatient laboratory, diagnostic and surgery services covered by the hospital contract will be subject to a $30 copayment. Effective January 1, 2010, charges for outpatient surgery services covered by the hospital contract will be subject to a $40 copayment per outpatient visit. These hospital outpatient copayments will be waived for persons admitted to the hospital as an inpatient directly from the outpatient setting, and for the following covered chronic care outpatient services; chemotherapy,

P 003035

radiation therapy, or hemodialysis. The copayment for pre-admission testing/pre-surgical testing prior to an inpatient admission will be waived. Hospital outpatient physical therapy visits will be subject to the same copayment in effect for physical therapy visits under the Managed Physical Network Program.

(c) Current coverage for services provided in the outpatient department of a hospital will be expanded to include services provided in a remote location of the hospital (hospital owned and operated extension clinics).  Emergency care provided in such remote location of the hospital will be subject to the $50 emergency room copayment. Effective January 1, 2010, emergency care provided in such remote location of the hospital will be subject to a $60 copayment.  Charges for outpatient laboratory, diagnostic and surgery services provided in such remote location of the hospital will be subject to a $30 copayment. Effective January 1, 2010, outpatient surgery services provided in such remote location of the hospital will be subject to a $40 copayment per outpatient visit.

(d) Charges for the attending hospital emergency room physician and providers who administer or interpret radiological exams, laboratory tests, electrocardiograms and pathology services directly associated with the covered hospital emergency room care for a medical emergency will be reimbursed under the participating provider or the basic medical program not subject to deductible or coinsurance when such services are not included in the hospital facility charge.

(e) The Empire Plan will continue to provide a voluntary "Centers of Excellence Program" for organ and tissue transplants. The Centers will be required to provide pre-transplant evaluation, hospital and physician service (inpatient and outpatient), transplant procedures, follow-up care for transplant-related services as determined by the Center and any other services as identified during implementation as part of an all inclusive global rate.  A travel allowance for transportation and lodging will be included as part of the Centers of Excellence Program.  The Joint Committee on Health Benefits will work with the State and Empire Plan carriers to provide ongoing oversight of this benefit.

P 003036

(f) Anesthesiology, pathology and radiology services received at a network hospital will be paid-in-full less any appropriate copayment even if the provider is not participating in the Empire Plan participating provider network under the medical component.

**2. Non-Network Coverage**

(a) The Hospital component (inpatient and outpatient services) of the Empire Plan will be as follows:

• Covered inpatient services received at a non-network hospital will be reimbursed at 90% of charges. There will be a separate $1,500 annual Hospital coinsurance maximum per enrollee, enrolled spouse/domestic partner and all dependent children combined established for non-network hospital out-of-pocket expenses.

• The $1,500 Hospital coinsurance maximum is for non-network hospital expenses only and cannot be combined with any coinsurance maximums for other Empire Plan components.

• Covered outpatient services received at a non-network hospital will be reimbursed at 90% of charges or a $75 copayment, whichever is greater. The non-network outpatient coinsurance will be applied toward the $1,500 annual coinsurance maximum.

• Once an enrollee has paid $500 in non-network coinsurance, amounts in excess of $500 are reimbursable under the Basic Medical Program up to a maximum of $1,000. Effective January 1, 2009, the maximum $1,000 reimbursement under the Basic Medical Program will be reduced to $500. Effective January 1, 2011, the maximum $500 reimbursement under the Basic Medical Program will be eliminated.

• Services received at a non-network hospital will be reimbursed at the network level of benefits under the following situations:

1. Emergency outpatient/inpatient treatment;

2. Inpatient/outpatient treatment only offered by a non-network hospital; and

3. Inpatient/outpatient treatment in geographic areas where access to a network hospital exceeds 30 miles does not exist;

4. Care received outside of the United States;

28

5. When another insurer, including Medicare is providing primary coverage.

• Once the annual coinsurance maximum has been met, coverage for inpatient services are paid in full and coverage for outpatient services shall be subject to the same copayments as those in effect under the network level of benefits.

**§9.3 Empire Plan Medical/Surgical**

The Empire Plan shall include medical/surgical coverage through use of participating providers who will accept the Plan's schedule of allowances as payment in full for covered services. Except as noted below, benefits will be paid directly to the provider at 100% of the Plan's schedule not subject to deductible, coinsurance, or annual/lifetime maximums.

(a) Office visit charges by participating providers will be subject to a $12 copay per covered individual. Effective July 1, 2009, office visit charges by participating providers will be subject to a $15 copayment per covered individual. Office visit charges by participating providers for well child care, including routine pediatric immunizations, will be excluded from the office visit copays.

(b) Charges by participating providers for professional services for allergen immunotherapy in the prescribing physician's office or institution will be excluded from the office visit copayment.

(c) All covered outpatient surgery procedures performed by a participating provider during a visit will be subject to a $12 copay. Effective July 1, 2009, all covered outpatient surgery procedures performed by participating providers will be subject to a $15 copayment per covered individual.

(d) In the event that there is both an office visit charge and an office surgery charge by a participating provider in any single visit, the covered individual will be subject to a single copayment.

(e) All covered diagnostic/laboratory services performed by a participating provider during a visit will be subject to a $12 copay. Effective July 1, 2009, all covered diagnostic/laboratory services performed by participating providers will be subject to a $15 copayment per covered individual.

(f) All covered outpatient radiology services performed by a participating provider during a visit will be subject to a $12 copay.

P 003038

Effective July 1, 2009, all covered radiology services performed by participating providers will be subject to a $15 copayment per covered individual.

(g) Outpatient radiology services and diagnostic/laboratory services rendered during a single visit by the same participating provider will be subject to a single copayment.

(h) Chronic care services for chemotherapy, radiation therapy, or hemodialysis will be excluded from the office visit copayment.

(i) The office visit, surgery, outpatient radiology, and diagnostic/laboratory copayments may be applied against the basic medical coinsurance maximum but they will not be considered covered expenses for basic medical payment.

(j) All covered outpatient surgery performed at a participating freestanding ambulatory surgery center will be subject to a $15 copayment. Effective July 1, 2008 all covered outpatient surgery performed by a participating ambulatory surgery center will be subject to a $30 copayment. Covered services shall include anesthesiology, radiology and laboratory tests performed on the same day of surgery.

**Empire Plan Basic Medical**

(k) The Empire Plan shall also include basic medical coverage to provide benefits when non-participating providers are used. These benefits will be paid directly to enrollees according to reasonable and customary charges and will be subject to deductible, coinsurance, and calendar year and lifetime maximums.

(l) The Empire Plan participating provider schedule of allowances and the basic medical reasonable and customary levels will be at least equal to those levels in effect on March 31, 2007.

(m) An annual evaluation and adjustment of basic medical reasonable and customary charges will be performed according to the guidelines established by the basic medical plan insurer.

(n) An Alternative Medicine Program which will allow Empire Plan enrollees and dependents to seek specified non-covered alternative treatments/services at a discounted employee-pay-all fee will be made available through a network of providers. The Joint Committee on Health Benefits will work with the State and appropriate carrier to provide ongoing oversight of the Complementary

P 003039

Alternative Medicine Program. Effective January 1 2009, the Complementary Alternative Medicine Program shall be eliminated.

### §9.4 CSEA Empire Plan Enhancements

In addition to the basic Empire Plan benefits, the Empire Plan for CSEA enrollees shall include:

(a) The basic medical component deductible shall equal $225 per enrollee, $225 per covered spouse/domestic partner, and $225 for one or all dependent children. Effective January 1, 2010, the basic medical component deductible shall equal $250 per enrollee, $250 per covered spouse/domestic partner, and $250 for one or all dependent children. Covered expenses for mental health and/or substance abuse treatment or physical medicine services are excluded in determining the basic medical component deductible.

(b) The maximum enrollee coinsurance out-of-pocket expense under the basic medical component shall equal $900 per individual or family in any one year. Effective January 1, 2009, the maximum enrollee coinsurance out-of-pocket expense under the basic medical component shall equal $500 for the enrollee, $500 for the covered spouse/domestic partner, and $500 for one or all dependent children in any one year. Effective January 1, 2011, the maximum enrollee coinsurance out-of-pocket expense under the basic medical component shall equal $515 for the enrollee, $515 for the covered spouse/domestic partner, and $515 for one or all dependent children in any one year. Employees in a title Salary Grade 6 or below or an employee equated to a position title Salary Grade 6 or below, the $900 maximum coinsurance out of-pocket expense under the basic medical component shall be reduced to a maximum of $500 in coinsurance per year. Effective January 1, 2009, the $500 maximum coinsurance out-of-pocket expense shall be reduced to $300 for the enrollee, $300 for the covered spouse/domestic partner, and $300 for one or all dependent children. Effective January 1, 2011, the $300 maximum coinsurance out-of-pocket expense shall equal $309 for the enrollee, $309 for the covered spouse/domestic partner, and $309 for one or all dependent children in any one year.

(c) Employees 50 years of age or older and their covered spouses/domestic partners 50 years of age or older will be allowed up to $250 reimbursement annually towards the cost of a routine physical

P 003040

examination provided by a non-participating physician. These benefits shall not be subject to a deductible and coinsurance.

(d) The cost of certain injectable adult immunizations shall be a covered expense, subject to copayment(s) under the participating provider portion of the Empire Plan.  The list of immunizations shall include Influenza, Pneumococcal, Measles, Mumps, Rubella, Varicella, Meningoccocal and Tetanus Toxoid, and shall be subject to protocols developed by the medical program insurer. Effective July 1, 2008, coverage will be expanded to include Herpes Zoster (Shingles), subject to appropriate protocols.

(e) Routine pediatric care, including well child office visits, physical examinations and pediatric immunizations, for children up to age 19 will be covered under the basic medical program, subject to deductible or coinsurance. Influenza vaccine is included on the list of pediatric immunizations, subject to appropriate protocols, under the participating provider and basic medical components of the Empire Plan.

(f) The routine newborn allowance under the basic medical component shall be $150, not subject to deductible or coinsurance.

(g) The annual and lifetime maximum for each covered member under the basic medical component shall be unlimited.

(h) Services for examinations and/or purchase of hearing aids shall be a covered basic medical benefit and shall be reimbursed up to a maximum of  $1,500, per hearing aid, per ear, once every four years, not subject to deductible or coinsurance. For children 12 and under the same benefits can be available after 24 months, when it is demonstrated that a covered child's hearing has changed significantly and the existing hearing aid(s) can no longer compensate for the child's hearing impairment.

(i) Covered charges for medically appropriate local professional ambulance transportation will be a covered basic medical expense subject only to a $35 copayment.  Volunteer ambulance transportation will continue to be reimbursed for donations at the current rate of $50 for under 50 miles and $75 for 50 miles or over. These amounts are not subject to deductible or coinsurance.

(j)  Mastectomy brassieres prescribed by a physician, including replacements when it is functionally necessary to do so, shall be a

32

P 003041

covered benefit under the Empire Plan. External mastectomy prostheses will be a covered in full benefit, not subject to deductible or coinsurance. Coverage will be provided by the medical carrier as follows:

• Benefits are available for one single/double mastectomy prosthesis in a calendar year.

• Pre-certification through the Home Care Advocacy Program is required for any single external prosthesis costing $1,000 or more. If a less expensive prosthesis can meet the individual's functional needs, benefits will be available for the most cost-effective alternative.

(k) The Pre-Tax Contribution Program will continue unless modified or exempted by the Federal Tax Code.

(l) A Medical Flexible Spending Account (MFSA) will continue to be provided. The Joint Committee on Health Benefits shall work with the State to provide ongoing oversight of the MFSA.

(m) The Empire Plan Centers of Excellence Programs will be expanded to include Cancer Resource Services. The Cancer Resource Program will provide:

• Direct telephonic nurse consultations;

• Information and assistance in locating appropriate care centers;

• Connection with cancer experts at Cancer Resource Services network facilities;

• A travel allowance; and

• Paid-in-full reimbursement for all services provided at a Cancer Resource Services network facility when the care is pre-certified.

(n) The Empire Plan medical carrier will establish a network of prosthetic and orthotic providers. Prostheses or orthotics obtained through an approved prosthetic/orthotic network provider will be paid in full under the participating provider component of the Empire Plan, not subject to copayment. For prostheses or orthotics obtained other than through an approved prosthetic/orthotic network provider, reimbursement will be made under the basic medical component of the Empire Plan, subject to deductible and coinsurance.

If more than one prosthetic or orthotic device can meet the indi-

P 003042

vidual's functional needs, benefits will be available for the most cost-effective piece of equipment. Benefits are provided for a single-unit prosthetic or orthotic device except when appropriate repair and/or replacement of devices are needed.

(o) A Basic Medical Provider Discount Program will be available through the basic medical component of the Empire Plan.

• Empire Plan enrollees will have access to an expanded network of providers through an additional provider network;

• Basic Medical provisions will apply to the providers in the expanded network option (deductible and 20% coinsurance);

• Payment will be made by the Plan directly to the discount providers, no balance billing of discounted rate will be permitted;

• This program is offered as a pilot program and will terminate on December 31, 2011, unless extended by agreement of both parties.

(p) Effective July 1, 2008, an annual diabetic shoe benefit will be available through the Home Care Advocacy Program under the medical carrier. Network coverage: Benefits paid at 100% with no out of pocket cost up to $500 maximum. Non-network Coverage: For diabetic shoes obtained other than through the Home Care Advocacy Program, reimbursement will be made under the basic medical component of the Empire Plan, subject to deductible and the remainder paid at 75% of the network allowance, up to maximum allowance of $500.

(q) Upon ratification, retroactive to January 1, 2008, prosthetic wigs shall be a covered basic medical benefit and shall be reimbursed up to a lifetime maximum of $1500, not subject to deductible or coinsurance.

(r) Effective July 1, 2008 or as soon as practicable thereafter, the Empire Plan medical carrier shall contract with Diabetes Education Centers accredited by the American Diabetes Education Recognition Program.

### §9.5 Empire Plan Mental Health and Substance Abuse

(a) The Empire Plan shall continue to provide comprehensive coverage for medically necessary mental health and substance abuse treatment services through a managed care network of preferred mental health and substance abuse care providers. Network

P 003043

and non-network benefits shall be those in effect on March 31, 2007, unless specifically modified by this agreement. The outpatient substance abuse treatment copayment shall continue to equal the participating provider office visit copayment. Expenses applied against the mental health and substance abuse non-network deductible and network copayments will not apply against any deductible or copayments or maximums under the basic medical component of the Plan. The maximum lifetime benefit for non-network substance abuse services shall be $250,000.

(b) A disease management program for depression will be available. As soon as practicable, disease management programs for eating disorders, including appropriate nutritionist services, and ADHD will be implemented.

### §9.6 Empire Plan Benefits Management Program

The current Benefits Management Program for CSEA employees enrolled in the Empire Plan shall remain in effect unless modified by the Joint Committee on Health Benefits.

(a) The Empire Plan Benefits Management Program's Prospective Procedure Review requirement will include only Magnetic Resonance Imaging ("MRI"). Effective July 1, 2008, the Empire Plan Benefits Management Program's Prospective Procedure Review requirements will include MRI, CAT and PET Scans, Nuclear Medicine and MRA's

(b) Any day deemed inappropriate for an inpatient setting and/or not medically necessary will be excluded from coverage under the Empire Plan.

### §9.7 Empire Plan Home Care Advocacy Program

The current Home Care Advocacy Program (HCAP) for CSEA employees enrolled in the Empire Plan shall continue.   Individuals who fail to have medically necessary designated HCAP services and supplies pre-certified by calling HCAP and/or individuals who use a non-network provider will receive reimbursement at 50 percent of the HCAP allowance for all services, equipment and supplies upon satisfying the basic medical annual deductible.   In addition, the basic medical out-of-pocket maximum will not apply to HCAP designated services, equipment and supplies.   All other HCAP non-network benefit provision will remain.

### §9.8 Empire Plan Managed Physical Medicine Program

(a) The Empire Plan's medical care component will continue to offer a comprehensive managed care network benefit for the provision of medically necessary physical medicine services, including

P 003044

physical therapy and chiropractic treatments. Authorized network care will be available, subject only to the Plan's participating provider office visit copayment(s). Unauthorized medically necessary care will also be available, subject to an annual deductible of $250 per enrollee, $250 per spouse/domestic partner and $250 for one or all dependent children and a maximum payment of 50% of the network allowance for the service(s) provided. Maximum benefits for non-network care will be limited to $1,500 in payments per calendar year. Deductible/coinsurance payments will not be applicable to the Plan's annual basic medical deductible/coinsurance maximums. The Joint Committee on Health Benefits will work with the State on the ongoing administration of this benefit. The participating provider office visit copayment(s) shall apply to covered physical therapy visits received at the outpatient department of the hospital.

### §9.9 Empire Plan Infertility Benefits Program

Empire Plan participating provider and basic medical coverage for the treatment of infertility will continue as follows:

(a) access to designated "Centers of Excellence" including travel benefit;

(b) enhance benefit to include the treatment of "couples" as long as both partners are covered either as enrollee or dependent under the Empire Plan;

(c) lifetime coverage limit per individual of $50,000;

(d) covered services: patient education/counseling, diagnostic testing, ovulation induction/hormonal therapy, surgery to enhance reproductive capability, artificial insemination and Assisted Reproductive Technology procedures;

(e) exclusions: experimental procedures, fertility drugs dispensed at a licensed pharmacy, medical and other charges for surrogacy, donor services/compensation in connection with pregnancy, storage of sperm, eggs and/or embryo for longer than 6 months and high risk patients with no reasonable expectation for pregnancy.

The Joint Committee on Health Benefits will work with the State and Empire Plan carriers on the ongoing oversight of this benefit. Additionally, ongoing Program oversight and evaluation of the lifetime coverage limit will enable future modification if warranted.

P 003045

### §9.10 Empire Plan Voluntary Nurse Line

The medical component of the Empire Plan shall include a voluntary 24-hour/7-days a week nurse-line feature to provide both clinical and benefit information through a toll-free phone number.

The Joint Committee on Health Benefits will work with the State and Empire Plan carriers on the ongoing oversight of this benefit.

### §9.11 Empire Plan Disease Management Program

The Empire Plan medical component shall include a voluntary disease management program. Disease Management covers those illnesses identified to be chronic, high cost, impact quality of life, and rely considerably on the patient's compliance with treatment protocols. The current Integrated Disease Management Program includes:  Chronic Obstructive Pulmonary Disease, Coronary Artery Disease, Heart Failure, Asthma and Diabetes. As soon as practicable, the Empire Plan Disease Management programs shall be expanded to include, but not be limited to, chronic kidney disease. Nutritional services will be covered for those programs identified when clinically appropriate.

The Joint Committee on Health Benefits will work with the State and Empire Plan carriers on the selection, design, implementation and ongoing oversight of the new and existing Disease Management Programs.

### §9.12 Health Maintenance Organizations

Eligible employees in the State Health Insurance Plan may elect to participate in a federally qualified or state certified Health Maintenance Organization which has been approved to participate in the State Health Insurance Program by the Joint Committee on Health Benefits.  If more than one HMO services the same geographic area, the Joint Committee on Health Benefits reserves the right to approve a contract with only such organization(s) deemed to be a quality, cost effective option(s).  The Joint Committee on Health Benefits will work with the State through the HMO Workgroup to identify and mutually agree upon appropriate incentives for HMO alternatives to become more competitive in quality of care provided and efficient in cost to payers.  Employees may change their health insurance option each year during the month of

P 003046

November, unless another period is mutually agreed upon by the State and the Joint Committee on Health Benefits. If the rate renewals are not available by the time of the open option transfer period, then the open transfer period shall be extended to assure ample time for employees to transfer.

### §9.13 Premium Contribution Level - Health Only

(a) The State agrees to pay 90 percent of the cost of individual coverage and 75 percent of the cost of dependent coverage toward the hospital/medical/mental health and substance abuse components provided under the Empire Plan.

(b) The State agrees to continue to provide alternative Health Maintenance Organization (HMO) coverage and agrees to pay 90 percent of the cost of individual coverage and 75 percent of the cost of dependent coverage toward the hospital/medical/mental health and substance abuse components of each HMO, however, not to exceed 100 percent of its dollar contribution for those components under the Empire Plan.

### §9.14 Prescription Drug Premium Contribution Level/Benefit Structure

(a) Eligible CSEA employees enrolled in the New York State Health Insurance Program (NYSHIP) will be provided with pre-scription drug coverage either through the Empire Plan Prescription Drug Program or a Health Maintenance Organization. The State agrees to pay 90 percent of the cost of individual coverage and 75 percent of the cost of dependent prescription drug coverage under the Empire Plan and Health Maintenance Organizations.

(b) The Empire Plan Prescription Drug Program benefits shall consist of the following:  Prescription Drug Program will cover medically necessary drugs, including vitamins and contraceptive drugs and devices, requiring a physician's prescription and dis-pensed by a licensed pharmacist.  Mandatory Generic Substitution will be required for all brand-name multisource prescription drugs (a brand-name drug with a generic equivalent) covered by the Prescription Drug Program. The three-tiered prescription drug ben-efit will continue.  The copayment for prescription drugs purchased at a retail pharmacy or the mail service pharmacy for up to a 30-day

P 003047

supply shall be as follows:
- $5 Generic
- $15 Preferred-Brand
- $30 Non-Preferred Brand ($40 effective July 1, 2008)

When a brand-name prescription drug is dispensed and an FDA-approved generic equivalent is available, the member will be responsible for the difference in cost between the generic drug and the non-preferred brand-name drug, plus the non-preferred brand-name copayment.

The copayment for prescription drugs purchased at a retail pharmacy for a 31-90 day supply shall be as follows:
- $10 Generic
- $30 Preferred Brand
- $60 Non-Preferred Brand ($70 effective July 1, 2008)

When a brand-name prescription drug is dispensed and an FDA-approved generic equivalent is available, the member will be responsible for the difference in cost between the generic drug and the non-preferred brand-name drug, plus the non-preferred brand-name copayment.

The copayment for prescription drugs purchased through the mail service pharmacy for a 31-90 day supply will be as follows:
- $5 Generic
- $20 Preferred Brand
- $55 Non-Preferred Brand ($65 effective July 1, 2008)

When a brand-name prescription drug is dispensed and an FDA-approved generic equivalent is available, the member will be responsible for the difference in cost between the generic drug and the non-preferred brand-name drug, plus the non-preferred brand-name copayment.

(c) Effective July 1, 2008, or as soon as practicable thereafter, "new to you" prescriptions will be limited to a 30-day initial supply at retail/mail prior to a 31-90 day supply being filled. The initial prescription will be filled for a 30-day supply (subject to appropriate 30-day copay). If the original prescription is written for over a 30-day supply, the enrollee can receive the remaining supply of the prescription up to 90-days. The balance of the appropriate 31-90 day copayment will be applied.

P 003048

### §9.15 Part-time Employees

The State Health Insurance Plans' regulations shall continue to stipulate that the term employee means any person in the service of the State as employer whose regular work schedule is at least half-time per bi-weekly payroll period.

### §9.16 Waiting Period

There shall be a waiting period of forty-two (42) days after employment before an employee shall be eligible for enrollment under the State's Health Insurance Program.

### §9.17 Dependent Proofs/Coverage

(a) Current and/or new enrollees opting for family coverage must provide the names of all covered dependents to the Plan Administrator. In the case of covered newborn dependents, names shall be provided within 3 months of the date of birth. Additionally, the social security numbers of a covered spouse, if applicable, and/or dependent student(s) over the age of 19, if applicable, shall be provided to the Plan Administrator in order to verify continued eligibility for family coverage and to facilitate coordination of benefits.

(b) Effective July 1, 2008, covered dependent students shall be provided with a 3-month extended benefit period upon completion of each semester as a covered full-time student (or equivalent). The benefit extension will begin on the first day of the month following the month in which dependent student coverage would otherwise end and will last for three months or until such time as eligibility would otherwise be lost under existing plan rules.

(c) Covered dependents of employees who are activated for military duty as a result of an action declared by the President of the United States or Congress shall continue health insurance coverage with no employee contribution for a period not to exceed 12 months from the date of activation, less any period the employee remains in full pay status. Contribution free health insurance coverage will end at such time as the employee's active duty is terminated or the employee returns to State employment, whichever occurs first.

### §9.18 Domestic Partners

Domestic partners who meet the definition of a partner and can provide acceptable proofs of financial interdependence as outlined

P 003049

in the Affidavit of Domestic Partnership and Affidavit of Financial Interdependency shall be eligible for health care coverage. As part of this agreement, the impact of such domestic partner coverage under the Empire Plan will continue to be reviewed through the Joint Committee on Health Benefits, including the appropriateness of the existing waiting periods.

### §9.19 Seasonal Employees

(a) Seasonal employees who, at the time of hire, are expected to be continuously employed on at least a half-time basis for at least six-months, shall be eligible to apply for health insurance coverage as of the date of employment. Coverage shall be subject to a 42-day new employee waiting period starting on the date of first employment, and benefits shall be available as of the 43rd day of employment, assuming the employee submitted a written application for coverage during the 42 day waiting period and was on the payroll or on authorized workers' compensation leave without pay for the entire 42 day waiting period.

(b) Seasonal employees who, at the time of hire, are not expected to be continuously employed on at least a half-time basis for at least six months, shall not be eligible for health benefits at the start of employment. However, upon actual completion of six months of continuous employment on at least a half-time basis, an employee so hired shall become eligible to apply for health benefits. Coverage shall become effective following the completion of a 42 day new employee waiting period that commences on the day following their completion of six months of such a work schedule, assuming the employee submits a written application for coverage during the waiting period, and remains on the payroll or on authorized workers' compensation leave without pay for the entire 42 day waiting period.

(c) Where the state establishes a seasonal position for six months or more, the appointee to that position shall not have his or her service intentionally broken solely for the purpose of rendering that employee ineligible for health insurance purposes. However, if that individual's service is broken for another reason, the individual shall not be eligible to continue coverage after employment is terminated, except as described in Section (d) below.

P 003050

(d) Should a seasonal employee who attained health insurance coverage under Section (a) or (b) above, leave the payroll and then be rehired subsequently, the employee shall retain eligibility for health insurance coverage upon rehire without being hired for an anticipated six month period of continuous employment on at least a half-time basis, provided the employee is not off the payroll more than six months. An employee so rehired may continue his or her health insurance by paying the full cost of the coverage for the period of time he or she is off the payroll, or, if not rehired, until the date that is six months from the date employment terminated.

### §9.20 Layoff

A permanent full-time employee who loses employment as a result of the abolition of a position on or after April 1, 1977, shall continue to be covered under the State Health Insurance Plan at the same contribution rate as an active employee for one year following such layoff or until reemployment by the State or employment by another employer, whichever first occurs.

### §9.21 Workers' Compensation

(a) A permanent full-time employee who is removed from the payroll due to an accepted work related injury or occupational condition shall remain covered under the State Health Insurance Plan and the terms as defined in §11.5 of this agreement.

(b) A permanent full-time employee who is removed from the payroll due to a controverted work related injury or occupational condition will have the right to apply for a health insurance premium waiver. The appropriate agency will be responsible to inform the employee of his or her right to apply for the waiver prior to the employee meeting the eligibility requirements for the waiver of premium.

(c)   Effective July 1, 2008, a permanent full-time employee who is removed from the payroll due to an assault, as described in Article 11.5, and is granted workers' compensation for up to 24 months shall remain covered under the State Health Insurance Plan for the same duration and will be responsible for the employee share of premium.

42

P 003051

### §9.22 Disabled/Deceased Employees

(a) Continued health insurance coverage will be provided for the unremarried spouse and other eligible dependents of employees who die in State service under circumstances under which they are eligible for the accidental death benefit or for weekly cash workers' compensation benefits under the same conditions prescribed in Section 165 of the Civil Service Law for dependents of a deceased employee who was at the time of death an employee at a correctional facility having individual and dependent coverage at the time of death and where death occurred as a result of injuries during the period from September 9 through 13, 1971.

(b) If an employee is granted a service-connected disability retirement by a retirement or pension plan or system administered and operated by the State of New York, the State will continue the health insurance of that employee on the same basis as any other retiring employee, regardless of the duration of the employee's service with the State.

### §9.23 Retirement/Deceased Employees

(a) The unremarried spouse and otherwise eligible dependent children of an employee, who retires after April 1, 1979, with ten or more years of active State service and subsequently dies, shall be permitted to continue coverage in the health insurance program with payment at the same contribution rates as required of active employees for the same coverage.

(b) The unremarried spouse and otherwise eligible dependent children of an active employee, who dies after April 1, 1979 and who, at the date of death, had at least 10 years of benefits eligible service and who was at least 45 years of age and was within 10 years of the minimum retirement age shall be permitted to continue coverage in the health insurance program with payment at the same contribution rates as required of active employees for the same coverage.

### §9.24 Service Requirements/Sick Leave Credit

(a) Employees covered by the State Health Insurance Plan have the right to retain health insurance after retirement upon completion of ten years of service.

(b) An employee who is eligible to continue health insurance coverage upon retirement is entitled to a sick leave credit to be used

P 003052

to defray any employee contribution toward the cost of the premium. The basic monthly value of the sick leave credit shall be calculated according to the procedures in use on March 31, 2007. Employees retiring on or after January 1, 1989 may elect an alternative method of applying the basic monthly value of the sick leave credit. Employees selecting the basic sick leave credit may elect to apply up to 100% of the calculated basic monthly value of the credit towards defraying the required contribution to the monthly premium during their own lifetime. If employees who elect that method predecease their eligible covered dependents, the dependents may continue to be covered, but must pay the applicable dependent survivor share of the premium. Employees selecting the alternative method may elect to apply only up to 70% of the calculated basic monthly value of the credit toward the monthly premium during their own lifetime. Upon the death of the employee, however, any eligible surviving dependents may also apply up to 70% of the basic monthly value of the sick leave credit toward the dependent survivor share of the monthly premium for the duration of the dependents' eligibility. The State has the right to make prospective changes to the percentage of credit to be available under this alternative method for future retirees as required to maintain the cost neutrality of this feature of the plan. The selection of the method of sick leave credit application must be made at the time of retirement, and is irrevocable. In the absence of a selection by the employee, the basic method shall be applied.

### §9.25 Deferral of Health Insurance

An employee retiring from State service may delay commencement or suspend his/her retiree health coverage and the use of the employee's sick leave conversion credits indefinitely, provided that the employee applies for the delay or suspension, and furnishes proof of continued coverage under the health care plan of the employee's spouse, or from post retirement employment.

### §9.26 Joint Committee on Health Benefits

(a) The State and CSEA agree to continue the Joint Committee on Health Benefits.

(b) The State shall seek the appropriation of funds by the Legislature to support committee initiatives and to carry out the

44                    P 003053

administrative responsibilities of the Joint Committee in the amount indicated for each year of the agreement: $1,150,000 in 2007-2008, 1,207,000 in 2008-2009, 1,268,000 in 2009-2010, and 1,331,000 in 2010-2011.

(c) The Joint Committee on Health Benefits shall work with appropriate State agencies to make mutually agreed upon changes in the Plan benefit structure through such initiatives as:

(1) The annual HMO Review Process;

(2) The ongoing review and oversight of the Empire Plan Medical Program, Hospital Program, Prescription Drug Program, and the Managed Mental Health and Substance Abuse Treatment Program;

(3) The ongoing review and oversight of the Managed Physical Medicine Program;

(4) The continuation of the Benefits Management Program and annual review of the list of procedures requiring Prospective Procedure Review.

(5) The Joint Committee on Health Benefits will work with the State and medical carrier to solicit and contract with credentialed radiological providers to provide mammography screening, according to the American Cancer Society's medical protocols, at the worksite and/or predetermined location. Reimbursement will be provided in accordance with the participating provider program, subject to the diagnostic copayment.

(6) The continuation of the ambulatory surgery benefit and monitoring of participating centers. The Joint Committee on Health Benefits will work with the State to oversee the solicitation by the medical/surgical/basic medical carrier of Ambulatory Surgical Centers in bordering states and in those states where retirees commonly reside.

(7) The continuation of the Home Care Advocacy Program (HCAP) and the ongoing review of services offered. The JCHB shall work with the State to review and monitor the utilization of DME under HCAP, specifically requests, approvals and denials of duplicate equipment. If necessary the State and CSEA Joint Committee will take appropriate action to address the issue.

45

P 003054

(8) The Joint Committee on Health Benefits will continue to review the impact of Domestic Partner coverage.

(9) The Joint Committee on Health Benefits will work with the State in the development of a Specialty Drug Program. Implementation of a Specialty Drug Program will not take place without the agreement of the CSEA Joint Committee.

(10) Upon ratification of the Agreement, the State and CSEA JCHB will undertake a comprehensive study of an alternative prescription drug program for Empire Plan enrollees. The State will appropriate sufficient funds from the Legislature to undertake such study, which may include research, on-site evaluations, case studies, and pilot programs. At the conclusion of the Study, a recommendation will be submitted jointly by the State and the CSEA Joint Committee.

(11) The JCHB will work with the State and the Empire Plan prescription drug carriers to analyze the concept of a flexible Preferred Drug List (PDL) formulary. No changes to the PDL shall occur without the agreement of the Joint Committee.

(12) The JCHB will work with the State to look at a copayment waiver program for office visits and prescription drugs when related to chronic conditions.

(13) The JCHB will work with the State to explore the implementation of additional Centers of Excellence Programs to include, but not be limited to Centers of Excellence for Bariatric Surgery. Nutritionist coverage will be available when clinically appropriate.

(14) The JCHB and the State will regularly review the potential role of nurse practitioners as providers in the Empire Plan. The review will consist of studying provider access issues and the availability of nurse practitioners in specific geographic areas. If the JCHB and State agree that action is needed, the CSEA JCHB is empowered to work with the State to implement a benefit.

(d) The Joint Committee's area of review and counsel shall include but not be limited to the following areas:

(1) Development of health benefit communication programs related to the consumption of health care services provided under the Plan.

P 003055

(2) Development, as appropriate in conjunction with the carriers, of revised benefit booklets, descriptive literature and claim forms.

(3) The CSEA Joint Committee on Health Benefits will work with the State to develop a "report card" which will include objective quality data to assist employees in selecting the health benefit plan that best meets the needs for the employee and their dependents.

(4) In cooperation with the State, the Joint Committee on Health Benefits will review the feasibility of providing employees with an Annual Health Insurance Buy-out.

(5) The Joint Committee on Health Benefits will work with the State to study the feasibility of an inclusive statewide "carve-out" program for prescription drugs.

(6) The JCHB will work with the State and medical carrier to develop an enhanced network of urgent care facilities.

(7) The JCHB will work with the State to study the feasibility of administering the Empire Plan through an alternate funding arrangement

(8) The JCHB will work with the State to implement a direct debit vehicle to be utilized under the Medical Flexible Spending Account.

(9) The JCHB shall study the feasibility of a two-person premium structure

(10) The procurement process conducted by the Department of Civil Service regarding contractual services for the Empire Plan will include CSEA Joint Committee on Health Benefits involvement as follows:

• Review and comment on the draft RFP before it is released
• Attendance at the pre-bidders conference
• Sufficient time for the Joint Committee to access and review the technical proposals prior to management interviews
• Participation in Management Interviews and Site visits
• Attendance at a formal cost proposal briefing
• Recommendation of a vendor

Due to the proprietary nature of the materials included in the cost proposals, the Joint Committee on Health Benefits will not have access to the actual cost proposal. The State reserves the right

P 003056

to make the final selection of a vendor after discussion with and consideration of CSEA's recommendation.

(11) The JCHB and the State will explore the feasibility of designing a network of participating hearing aid providers.

(e) The Joint Committee shall work with appropriate State agencies to review and oversee the various health plans available to employees represented by CSEA.

(f) The Joint Committee on Health Benefits shall work with appropriate State agencies to monitor future employer and employee health plan cost adjustments.

(g) The Joint Committee shall be provided with each carrier rate renewal request upon submission and be briefed in detail periodically on the status of the development of each rate renewal.

(h) The State shall require that the insurance carriers for the State Health Insurance Plan submit claims and experience data reports directly to the Joint Committee on Health Benefits in the format and with such frequency as the Committee shall determine.

(i) The Joint Committee will be responsible for the annual review of participating providers. The Joint Committee shall investigate and where feasible, take appropriate action to recruit additional providers in geographic and specialty areas determined by the Committee to be deficient. The JCHB will work with the State to study participating provider access under the Empire Plan Medical component to determine the feasibility of a guaranteed access benefit.

(j) The Joint Committee shall continue to sponsor the agency health insurance administrator-training program.

(k) The Joint Committee shall study recurring subscriber complaints and make recommendations for the resolution of such complaints.

(l) The Joint Committee on Health Benefits shall meet within 14 days after a request to meet has been made by either side.

(m) The Joint Committee shall study and address other issues and concerns brought to the attention of the Committee that impact the accessibility, quality and costs of health care for employees covered by this Agreement.

P 003057

### §9.27 Communications

Appropriate descriptive material relating to any changes in benefits shall be distributed to each State agency for internal distribution prior to the effective date of the change in benefit. The State shall take all steps necessary to provide revised health insurance booklets to every employee as soon as possible. The Joint Committee on Health Benefits shall provide review and counsel on the development of the revised booklets.

### §9.28 Confidentiality

The confidentiality of individual subscriber claims shall not be violated. Except as required to conduct financial and claims processing audits of carriers and coordination of benefit provisions, specific individual claims data, reports or summaries shall not be released by the carrier to any party without the written consent of the individual, insured employee or covered dependent.

## ARTICLE 10
## Attendance and Leave

### §10.1  Holiday Observance

(a) An employee who is entitled to time off with pay on days observed as holidays by the State as an employer shall be granted compensatory time off when any such holiday falls on a Saturday; provided, however, that employees scheduled or directed to work on any such Saturday may receive additional compensation in lieu of such compensatory time off in accordance with Section 7.16 of this Agreement. The State may designate a day to be observed as a holiday in lieu of such holiday which falls on Saturday.

(b) The following holidays will be observed by all employees within this unit eligible to observe holidays unless otherwise specified by mutual agreement between the parties:

1. New Year's Day
2. Martin Luther King Day
3. Lincoln's Birthday
4. Washington's Birthday
5. Memorial Day
6. Independence Day
7. Labor Day
8. Columbus Day
9. Election Day
10. Veterans Day
11. Thanksgiving Day
12. Christmas Day

P 003058

## ARTICLE 48
### Eligible List-Stays

In the event the use of an eligible list is stayed pursuant to court order, upon the removal of such stay such eligible list shall continue in existence for a period not less than 60 days and for such additional period as may be determined by the Department of Civil Service, except that in no event shall such 60-day period extend the life of any eligible list beyond the statutory limit of four years.

## ARTICLE 49
### Printing of Agreement

The Civil Service Employees Association shall cause this Agreement to be printed and shall furnish the State with a sufficient number of copies for its use.  The State agrees to provide each employee initially appointed on or after the date of this Agreement a copy thereof as soon as practicable following the employee's first day of work.  The cost of printing this Agreement shall be shared equally by the State and CSEA.

## ARTICLE 50
### Conclusion of Collective Negotiations

This Agreement is the entire agreement between the State and CSEA, terminates all prior agreements and understandings and concludes all collective negotiations during its term.  During the term of this Agreement, neither party will unilaterally seek to modify its terms through legislation or any other means.  The parties agree to support jointly any legislation or administrative action necessary to implement the provisions of this Agreement.  The parties acknowledge that, except as otherwise expressly provided herein, they have fully negotiated with respect to the terms and conditions of employment and have settled them for the term of this Agreement in accordance with the provisions thereof.

## ARTICLE 51
### Severability

In the event that any article, section or portion of this Agreement is found to be invalid by a decision of a tribunal of competent juris-

P 003135

diction or shall have the effect of loss to the State of funds made available through Federal law, then such specific article, section or portion specified in such decision or having such effect shall be of no force and effect, but the remainder of this Agreement shall continue in full force and effect.  Upon the issuance of such a decision or the issuance of a ruling having such effect of loss of Federal funds, then either party shall have the right immediately to reopen negotiations with respect to a substitute for such article, section or portion of this Agreement involved.  The parties agree to use their best efforts to contest any such loss of Federal funds which may be threatened.  In the event that the Legislature fails to implement Section 7.1, any or all articles may be reopened at the option of CSEA or the State, and renegotiated.  In the event that any other article, section or portion of this Agreement fails to be implemented by the Legislature, then in that event, such article, section or portion may be reopened by CSEA or the State and renegotiated. During the course of any reopened negotiations any provision of this Agreement not affected by such reopener shall remain in full force and effect.

## ARTICLE 52
## APPROVAL OF THE LEGISLATURE

**IT IS AGREED BY AND BETWEEN THE PARTIES THAT ANY PROVISION OF THIS AGREEMENT REQUIRING LEGISLATIVE ACTION TO PERMIT ITS IMPLEMENTATION BY AMENDMENT OF LAW OR BY PROVIDING THE ADDITIONAL FUNDS THEREFORE, SHALL NOT BECOME EFFECTIVE UNTIL THE APPROPRIATE LEGISLATIVE BODY HAS GIVEN APPROVAL.**

## ARTICLE 53
**Duration of Agreement**
The term of this Agreement shall be from April 2, 2007 to April 1, 2011.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be signed by their respective representatives on February 1, 2008.

P 003136

## THE EXECUTIVE BRANCH OF THE STATE OF NEW YORK

**Gary Johnson**
Director of GOER

**John V. Currier**
Deputy Director for Contract Negotiations and Administration

**Michael F. McDonald**
Assistant Director

**Caroline D. Melkonian**
Assistant Director

**Walter J. Pellegrini, Esq.**
General Counsel

**Priscilla E. Feinberg**
Assistant Director, Employee Benefits Management

### Team Members

| | | |
|---|---|---|
| Mary Ackley | Craig Dickinson | Kathleen Nealon |
| Valerie Ayers | James Doar | Lorraine Nicholas |
| Deb Berg | Cameron Findlay | Chuck Parmentier |
| Linda Boettner | Lisa Fitzmaurice | Teresa Prescott |
| Stephen Boland | Steve France | Dina Ross |
| Sheila Brand | Cheryle Giroux | Michael Ryan |
| Patricia Briggs | Walter Greenberg | Blaine Ryan-Lynch |
| Robert Brondi | Peg Harrigan | Paul Sadalon |
| Deborah Dammer | Sue Ann Hart | Susan Schmidt |
| Dan Cunningham | Amanda Hoffman | Onnolee Smith |
| Larry Decker | Bob Hoffmeister | James Taylor |
| Vincent DePaul | Katy Jordan | Diana Valenchis |
| Lou DeSol | Stephanie Jubic | Robert Valla |
| Cheryle Giroux | Gail Kilmartin | Chuck Vejvoda |
| Walter Greenberg | Michael Kramek | Christine Williams |
| Peg Harrigan | Debye Lurie | Jason Windsor |
| Sue Ann Hart | Jim Mancuso | Anthony Zepetello |
| Amanda Hoffman | Mary McGinty | |
| Bob Hoffmeister | Kate McKee | |

128

P 003137

**CIVIL SERVICE EMPLOYEES ASSOCIATION, INC., LOCAL 1000, AFSCME, AFL-CIO**

**Danny Donohue**
President

**Ross D. Hanna**
Director of Contract Administration, Chief Negotiator

**James Hennerty**
Deputy Director of Contract Administration

**Mary Rubilotta**
Deputy Director of Contract Administration

**Guy Dugas**
Deputy Director of Contract Administration

**Denise Plunkett**
Staff Secretary

**Team Members:**

**William VanGuilder, Chair**
Deborah Downey
Tom Moylan
Dawn Smith
James Staley
Kathleen Walpole

P 003138