Exhibit 6

# AGREEMENT

## BETWEEN

## CSEA, Inc.
### Local 1000 AFSCME, AFL-CIO

### and

## THE STATE OF NEW YORK

# Administrative
# Services Unit

 

 3

## 1999 – 2003

P 002640

## ADMINISTRATIVE SERVICES UNIT AGREEMENT

Agreement made by and between the Executive Branch of the State of New York (the "State") and The Civil Service Employees Association, Inc. ("CSEA").

## ARTICLE 1
### Recognition

The State, pursuant to the certification of the Public Employment Relations Board, recognizes CSEA as the exclusive representative for collective negotiations with respect to salaries, wages, hours and other terms and conditions of employment of employees serving in positions in the Administrative Services Unit and similar positions hereafter created. The terms "employee" or "employees" as used in this Agreement shall mean only employees serving in positions in such unit and shall include seasonal employees where so specified.

## ARTICLE 2
### Statement of Policy and Purpose

**§2.1** It is the policy of the State to continue harmonious and cooperative relationships with its employees and to ensure the orderly and uninterrupted operations of government. This policy is effectuated by the provisions of the Public Employees' Fair Employment Act granting public employees the rights of organization and collective representation concerning the determination of the terms and conditions of their employment.

**§2.2** The State and CSEA now desire to enter into an

P 002647

### ARTICLE 9
### Health Insurance

§9.1 (a) The State shall continue to provide all the forms and extent of coverage as defined by the contracts in force on March 31,1999 with the State's health insurance carriers unless specifically modified by this Agreement.

(b) The State shall provide toll-free telephone service at the Department of Civil Service Health Insurance Section for information and assistance to employees and dependents on health insurance matters.

§9.2 (a) Charges for outpatient services covered by the hospital contract, including emergency room services, will be subject to a $25 copayment per outpatient visit. Effective January 1, 1999, this copayment will increase to $30 for emergency room services. Effective January 1, 2002, the copayment for emergency room services will increase to $35. Charges for other outpatient services covered by the hospital contract will continue to be subject to a $25 copayment. These hospital outpatient copayments will be waived for persons admitted to the hospital as an inpatient directly from the outpatient setting, pre-admission testing/pre-surgical testing prior to an inpatient admission and for the following covered chronic care outpatient services: chemotherapy, radiation therapy, hemodialysis or physical therapy. Effective July 1, 2000, hospital outpatient physical therapy visits will be subject to the same copayment in effect for physical therapy visits under the Managed Physical Network Program.

(b) Charges for the attending hospital emergency

32

P 002673

room physician and providers who administer or interpret radiological exams, laboratory tests, electrocardiograms and pathology services directly associated with the covered hospital emergency room care for a medical emergency will be reimbursed under the participating provider or the basic medical program not subject to deductible or coinsurance when such services are not included in the hospital facility charge.

(c) Effective July 1, 2000, or as soon as practicable thereafter, the Empire Plan will include a voluntary "Centers of Excellence Program" for organ and tissue transplants. The Center will be required to provide pre-transplant evaluation, hospital and physician service (inpatient and outpatient), transplant procedures, follow-up care for transplant-related services as determined by the Center and any other services as identified during implementation as part of an all inclusive global rate. A travel allowance for transportation and lodging will be included as part of the Centers of Excellence Program. The Joint Committee on Health Benefits will work with the State and Empire Plan carriers in the design, implementation and ongoing oversight of this benefit.

**§9.3** The Empire Plan shall include medical/surgical coverage through use of participating providers who will accept the Plan's schedule of allowances as payment in full for covered services. Except as noted below, benefits will be paid directly to the provider at 100% of the Plan's schedule not subject to deductible, coinsurance, or annual lifetime maximums.

(a) Office visit charges by participating providers will be subject to a $5 copay per covered individual. Effective January 1, 2001, office visit charges by participating providers will be subject to an $8 copayment

33

P 002674

per covered individual. Effective January 1, 2003, office visit charges by participating providers will be subject to a $10 copayment per covered individual. Office visit charges by participating providers for well child care, including routine pediatric immunizations, will be excluded from the office visit copays.

(b) Charges by participating providers for professional services for allergen immunotherapy in the prescribing physician's office or institution will be excluded from the office visit copayment.

(c) All covered outpatient surgery procedures performed by a participating provider during a visit will be subject to a $5 copay. Effective January 1, 2001, all covered outpatient surgery procedures performed by participating providers will be subject to an $8 copayment per covered individual. Effective January 1, 2003, all covered outpatient surgery procedures performed by participating providers will be subject to a $10 copayment per covered individual.

(d) In the event that there is both an office visit charge and an office surgery charge by a participating provider in any single visit, the covered individual will be subject to a single copayment.

(e) All covered diagnostic/laboratory services performed by a participating provider during a visit will be subject to a $5 copay. Effective January 1, 2001, all covered diagnostic/laboratory services performed by participating providers will be subject to an $8 copayment per covered individual. Effective January 1, 2003, all covered diagnostic/laboratory services performed by participating providers will be subject to a $10 copayment per covered individual.

(f) All covered outpatient radiology services performed by a participating provider during a visit will

34

P 002675

be subject to a $5 copay. Effective January 1, 2001, all covered radiology services performed by participating providers will be subject to an $8 copayment per covered individual. Effective January 1, 2003, all covered radiology services performed by participating providers will be subject to a $10 copayment per covered individual.

(g) Outpatient radiology services and diagnostic/laboratory services rendered during a single visit by the same participating provider will be subject to a single copayment.

(h) Chronic care services for chemotherapy, radiation therapy, or hemodialysis will be excluded from the office visit copayment.

(i) The office visit, surgery, outpatient radiology, and diagnostic/laboratory copayments may be applied against the basic medical coinsurance maximum but they will not be considered covered expenses for basic medical payment.

(j) The Empire Plan shall also include basic medical coverage to provide benefits when non-participating providers are used. These benefits will be paid directly to enrollees according to reasonable and customary charges and will be subject to deductible, coinsurance, and calendar year and lifetime maximums.

(k) The Empire Plan participating provider schedule of allowances and the basic medical reasonable and customary levels will be at least equal to those levels in effect on March 31, 1995.

(l) An annual evaluation and adjustment of basic medical reasonable and customary charges will be performed according to the guidelines established by the basic medical plan insurer.

(m) As soon as practicable, an Alternative Medicine

35

P 002676

Program which will allow Empire Plan enrollees and dependents to seek specified non-covered alternative treatments/services at a discounted employee-pay-all fee will be made available through a network of providers. The Joint Committee on Health Benefits will work with the State and appropriate carrier to design and implement this Program.

**§9.4 CSEA Empire Plan Enhancements**

In addition to the basic Empire Plan benefits, the Empire Plan for CSEA enrollees shall include:

(a) The basic medical component deductible shall remain at $161 per enrollee, $161 per covered spouse/domestic partner, and $161 for one or all dependent children. Effective January 1, 2001, the basic medical component deductible shall equal $175 per enrollee, $175 per covered spouse/domestic partner, and $175 for one or all dependent children. Effective January 1, 2003, the basic medical component deductible shall equal $185 per enrollee, $185 per covered spouse/domestic partner, and $185 for one or all dependent children. Covered expenses for mental health and/or substance abuse treatment or physical medicine services are excluded in determining the basic medical component deductible.

(b) The maximum enrollee coinsurance out-of-pocket expense under the basic medical component shall remain $776 per individual or family in any one year. For employees earning $21,696 or less in base annual salary on April 1, 1999; $23,017 or less in base annual salary on April 1, 2000; $23,823 or less in base annual salary on April 1, 2001; and $24,657 or less in base annual salary on April 1, 2002, the $776 maximum coinsurance out-of-pocket expense shall continue to be reduced to a maximum of $500 in coinsurance

36

P 002677

per year upon application to the Department of Civil Service for the reduction in coinsurance, and upon submission of information showing that the employee is the head of household and sole wage earner in a family. Covered expenses for mental health and/or substance abuse treatment or physical medicine services are excluded in determining the $776/$500 maximum coinsurance limits.

(c) Employees 50 years of age or older shall be allowed reimbursement up to $250 once every two years towards the cost of a routine physical examination. Covered spouses/domestic partners 50 years of age or older shall be allowed reimbursement up to $250 once every two years towards the cost of a routine physical examination. These benefits shall not be subject to a deductible and coinsurance. Effective July 1, 2000, employees 50 years of age or older and their covered spouses/domestic partners 50 years of age or older will be allowed up to $250 reimbursement annually towards the cost of a routine physical examination.

(d) Effective July 1, 2000, the cost of certain injectable adult immunizations shall be a covered expense, subject to copayment(s) under the participating provider portion of the Empire Plan. The list of immunizations shall include Influenza, Pneumococcal, Measles, Mumps, Rubella, Varicella and Tetanus Toxoid, and shall be subject to protocols developed by the medical program insurer.

The Joint Committee on Health Benefits shall work with the State to explore the addition of Lyme Vaccine to the list of injectable adult immunizations based on the State's workplace pilot project and the long term effectiveness of the vaccine.

37

P 002678

(e) Routine pediatric care, including well child office visits, physical examinations and pediatric immunizations, for children up to age 19 will be covered under the basic medical program, subject to deductible or coinsurance. Effective July 1, 2000, influenza vaccine will be added to the list of pediatric immunizations, subject to appropriate protocols, under the participating provider and basic medical components of the Empire Plan.

(f) The routine newborn allowance under the basic medical component shall be $100, not subject to deductible or coinsurance. Effective July 1, 2000, the routine newborn allowance under the basic medical component shall be $150, not subject to deductible or coinsurance.

(g) The annual and lifetime maximum for each covered member under the basic medical component shall be unlimited.

(h) Services for examinations and/or purchase of hearing aids shall be a covered basic medical benefit and shall be reimbursed up to a maximum of $600 once every four years, not subject to deductible or coinsurance. Effective January 1, 2000, the hearing aid reimbursement will be increased to $800; effective January 1, 2001, the hearing aid reimbursement will be increased to $1,000; and, effective January 1, 2002, the hearing aid reimbursement will be increased to $1,200. For children 12 and under the same benefits can be available after 24 months, when it is demonstrated that a covered child's hearing has changed significantly and the existing hearing aid(s) can no longer compensate for the child's hearing impairment.

(i) Covered charges for medically appropriate local professional ambulance transportation will be a cov-

38

P 002679

ered basic medical expense subject only to a $35 copayment. Volunteer ambulance transportation will continue to be reimbursed for donations at the current rate of $50 for under 50 miles and $75 for 50 miles or over. These amounts are not subject to deductible or coinsurance.

(j) Mastectomy brassieres prescribed by a physician, including replacements when it is functionally necessary to do so, shall be a covered benefit under the Empire Plan.

(k) The Pre-Tax Contribution Program will continue unless modified or exempted by the Federal Tax Code.

(l) Effective January 1, 2001, or as soon as practicable thereafter, a Medical Flexible Spending Account (MFSA) shall be established. The Joint Committee on Health Benefits shall work with the State on the design and implementation of the MFSA.

**§9.5** The Empire Plan shall continue to provide comprehensive coverage for medically necessary mental health and substance abuse treatment services through a managed care network of preferred mental health and substance abuse care providers. Network and non-network benefits shall be those in effect on March 31, 1999 with exception of the copayment for outpatient substance abuse treatment. The outpatient substance abuse treatment copayment shall continue to equal the participating provider office visit copayment. Expenses applied against the mental health and substance abuse non-network deductible and network copay levels will not apply against any deductible or copay levels or maximums under the basic medical component of the Plan.

**§9.6** The current Benefits Management Program for CSEA employees enrolled in the Empire Plan shall

39

P 002680

remain in effect unless modified by the Joint Committee on Health Benefits.

(a) The Empire Plan Benefits Management Program's Prospective Procedure Review requirement will include only Magnetic Resonance Imaging ("MRI") and will discontinue mandatory Specialty Consultation Evaluations.

**§9.7** The current Home Care Advocacy Program (HCAP) for CSEA employees enrolled in the Empire Plan shall be modified effective January 1, 2001 as follows: As of that date, individuals who fail to have medically necessary designated HCAP services and supplies pre-certified by calling HCAP and/or individuals who use a non-network provider will receive reimbursement at 50 percent of the HCAP allowance for all services, equipment and supplies upon satisfying the basic medical annual deductible. In addition, the basic medical out-of-pocket maximum will not apply to HCAP designated services, equipment and supplies. All other HCAP non-network benefit provision will remain.

**§9.8** The Empire Plan's medical care component will continue to offer a comprehensive managed care network benefit for the provision of medically necessary physical medicine services, including physical therapy and chiropractic treatments. Authorized network care will be available, subject only to the Plan's participating provider office visit copayment(s). Unauthorized medically necessary care, at enrollee choice, will also be available, subject, however, to an annual deductible of $250 per enrollee, $250 per spouse/domestic partner and $250 for one or all dependent children and a maximum payment of 50% of the network allowance for the service(s) provided. Maximum benefits for non-

40

P 002681

network care will be limited to $1,500 in payments per calendar year. Deductible/coinsurance payments will not be applicable to the Plan's annual basic medical deductible/coinsurance maximums.    The Joint Committee on Health Benefits will work with the State on the ongoing administration of this benefit. Effective July 1, 2000, the participating provider office visit copayment(s) shall apply to covered physical therapy visits received at the outpatient department of the hospital.

**§9.9** Effective July 1, 2000, Empire Plan participating provider and basic medical coverage for the treatment of infertility will be modified as follows:

(a) access to designated "Centers of Excellence" including travel benefit;

(b) enhance benefit to include the treatment of "couples" as long as both partners are covered either as enrollee or dependent under the Empire Plan;

(c) lifetime coverage limit per individual of $25,000;

(d) covered services: patient education/counseling, diagnostic testing, ovulation induction/hormonal therapy, surgery to enhance reproductive capability, artificial insemination and Assisted Reproductive Technology procedures;

(e) exclusions:    experimental procedures, fertility drugs dispensed at a licensed pharmacy, medical and other charges for surrogacy, donor services/compensation in connection with pregnancy, storage of sperm, eggs and/or embryo for longer than 6 months and high risk patients with no reasonable expectation for pregnancy.

The Joint Committee on Health Benefits will work with the State and Empire Plan carriers on the design and implementation of this benefit.    Additionally,

41

P 002682

ongoing Program oversight and evaluation of the life-time coverage limit will enable future modification if warranted.

**§9.10**  Effective July 1, 2000, or as soon as practicable thereafter, the medical component of the Empire Plan shall include a voluntary 24-hour/7-days a week nurse line feature to provide both clinical and benefit information through a toll-free phone number.

The Joint Committee on Health Benefits will work with the State and Empire Plan carriers on the design, implementation and ongoing oversight of this benefit.

**§9.11**  Effective July 1, 2000, or as soon as practicable thereafter, the Empire Plan medical component shall include a voluntary disease management program. Disease Management covers those illnesses identified to be chronic, high cost, impact quality of life, and rely considerably on the patient's compliance with treatment protocols.

The Joint Committee on Health Benefits will work with the State and Empire Plan carriers on the design, implementation and ongoing oversight of this benefit.

**§9.12**  Eligible employees in the New York State Health Insurance Plan (NYSHIP) may elect to participate in a federally qualified or State certified Health Maintenance Organization (HMO) which has been approved to participate in the State Health Insurance Program by the Joint Committee on Health Benefits. If more than one HMO services the same geographic area, the Joint Committee on Health Benefits reserves the right to approve a contract with only such organization(s) deemed to be a quality, cost effective option(s).  The Joint Committee on Health Benefits will work with the State through the HMO Workgroup to identify and mutually agree upon appropriate incen-

42

P 002683

tives for HMO alternatives to become more competi-
tive in quality of care provided and efficient in cost to
payers. Employees may change their health insurance
option each year during the month of November,
unless another period is mutually agreed upon by the
State and the Joint Committee on Health Benefits. If
the rate renewals are not available by the time of the
open option transfer period, then the open transfer
period shall be extended to assure ample time for
employees to transfer.

§9.13 (a) The State agrees to pay 90 percent of the
cost of individual coverage and 75 percent of the cost
of dependent coverage toward the hospital/medical/
mental health and substance abuse components pro-
vided under the Empire Plan.

(b) The State agrees to continue to provide alterna-
tive HMO coverage and, effective January 1, 1999,
agrees to pay 90 percent of the cost of individual cov-
erage and 75 percent of the cost of dependent coverage
toward the hospital/medical/mental health and sub-
stance abuse components of each HMO, however, not
to exceed 100 percent of its dollar contribution for
those components under the Empire Plan.

§9.14 (a) Effective April 29, 1999, eligible CSEA
employees enrolled in the NYSHIP will be provided
with prescription drug coverage either through the
Empire Plan Prescription Drug Program or a Health
Maintenance Organization. For those enrolled in the
Empire Plan, the benefits provided will be the same
benefits as those provided to Management/
Confidential employees enrolled in the Empire Plan
Prescription Drug Program. Effective April 29, 1999,
the State agrees to pay 90 percent of the cost of indi-
vidual coverage and 75 percent of the cost of depend-

43

P 002684

ent prescription drug coverage under the Empire Plan and Health Maintenance Organizations. Effective July 1, 2000, the State agrees to pay 100 percent of the cost of individual coverage and 100 percent of the cost of dependent prescription drug coverage under the Empire Plan and Health Maintenance Organizations. Effective January 1, 2003, the State agrees to pay 90 percent of the cost of individual coverage and 75 percent of the cost of dependent prescription drug coverage under the Empire Plan and Health Maintenance Organizations.

(b) The Empire Plan Prescription Drug Program benefits shall consist of the following: Prescription Drug Program will cover medically necessary drugs, including vitamins and contraceptives, requiring a physician's prescription and dispensed by a licensed pharmacist. Mandatory Generic Substitution will be required for all brand-name multisource prescription drugs (a brand-name drug with a generic equivalent) covered by the Prescription Drug Program. When a brand-name multisource drug is dispensed, the Program will reimburse the pharmacy (or enrollee) for the cost of the drug's generic equivalent. The enrollee is responsible for the cost difference between the brand-name drug and its generic equivalent plus the brand-name copayment.

Effective April 29, 1999:

♦ The copayment will be $8.00 for up to a 90 day supply of generic drugs dispensed at either the community pharmacy or the mail service pharmacy.

Effective July 1, 2000:

♦ The copayment will be $3.00 for up to a 90 day supply of generic drugs dispensed at either the

44

community pharmacy or the mail service pharmacy.

◆The copayment will be $13.00 for up to a 90 day supply of brand-name drugs dispensed at either the community pharmacy or the mail service pharmacy.

Effective January 1, 2003:

◆The copayment will be $5.00 for up to a 90 day supply of generic drugs dispensed at either the community pharmacy or the mail service pharmacy.

◆The copayment will be $15.00 for up to a 90 day supply of brand-name drugs dispensed at either the community pharmacy or the mail service pharmacy.

**§9.15** The State Health Insurance Plans' regulations shall continue to stipulate that the term employee means any person in the service of the State as employer whose regular work schedule is at least half-time per bi-weekly payroll period.

**§9.16** There shall be a waiting period of forty-two (42) days after employment before an employee shall be eligible for enrollment under the State's Health Insurance Program.

**§9.17** (a) Current and/or new enrollees opting for family coverage must provide the names of all covered dependents to the Plan Administrator. In the case of covered newborn dependents, names shall be provided within three (3) months of the date of birth. Additionally, the social security numbers of a covered spouse, if applicable, and/or dependent student(s) over the age of 19, if applicable, shall be provided to the Plan Administrator in order to verify continued eligibility for family coverage and to facilitate coordination

45

P 002686

of benefits.

(b) Effective May 1, 2000, or as soon as practicable thereafter, covered dependent students shall be provided with a three-month extended benefit period upon graduation from a qualified course of study. The benefit extension will begin on the first day of the month following the month in which dependent student coverage would otherwise end and will last for three months or until such time as eligibility would otherwise be lost under existing plan rules.

(c) Effective July 1, 2000, covered dependents of employees who are activated for military duty as a result of an action declared by the President of the United States or Congress shall continue health insurance coverage with no employee contribution for a period not to exceed 12 months from the date of activation, less any period the employee remains in full pay status. Contribution free health insurance coverage will end at such time as the employee's active duty is terminated or the employee returns to State employment, whichever occurs first.

**§9.18** Domestic partners who meet the definition of a partner and can provide acceptable proofs of financial interdependence as outlined in the Affidavit of Domestic Partnership and Affidavit of Financial Interdependency shall be eligible for health care coverage. As part of this agreement, the impact of such domestic partner coverage under the Empire Plan will continue to be reviewed through the Joint Committee on Health Benefits, including the appropriateness of the existing waiting periods.

**§9.19** (a) Seasonal employees who are anticipated to be or who are continuously employed on at least a half-time basis for six months, shall be eligible for

46

health insurance coverage subject to the provisions of the Agreement.

(b) Where the State establishes a seasonal position for six months or more, the appointee to that position shall not have his/her service intentionally broken solely for the purpose of rendering that employee ineligible for health insurance coverage.

(c) Should a seasonal employee who attained health insurance coverage eligibility leave the payroll and then be rehired subsequently, the employee shall retain eligibility for health insurance coverage upon rehire without application of a six-month waiting period, provided the employee was not off the payroll more than six months. The employee may continue his/her health insurance on a full pay basis for the period of time he/she is off the payroll.

**§9.20** A permanent full-time employee who loses employment as a result of the abolition of a position on or after April 1, 1977, shall continue to be covered under the State Health Insurance Plan at the same contribution rate as an active employee for one year following such layoff or until reemployment by the State or employment by another employer, whichever first occurs.

**§9.21** (a) A permanent full-time employee who is removed from the payroll due to an accepted work related injury or occupational condition shall remain covered under the State Health Insurance Plan and the terms as defined in §11.5 of this Agreement.

(b) A permanent full-time employee who is removed from the payroll due to a controverted work related injury or occupational condition will have the right to apply for a health insurance premium waiver. The appropriate agency will be responsible to inform the

47

P 002688

employee of his or her right to apply for the waiver prior to the employee meeting the eligibility requirements for the waiver of premium.

§9.22 (a) Continued health insurance coverage will be provided for the unremarried spouse and other eligible dependents of employees who die in State service under circumstances under which they are eligible for the accidental death benefit or for weekly cash workers' compensation benefits under the same conditions prescribed in Section 165 of the Civil Service Law for dependents of a deceased employee who was at the time of death an employee at a correctional facility having individual and dependent coverage at the time of death and where death occurred as a result of injuries during the period from September 9 through 13, 1971.

(b) If an employee is granted a service-connected disability retirement by a retirement or pension plan or system administered and operated by the State of New York, the State will continue the health insurance of that employee on the same basis as any other retiring employee, regardless of the duration of the employee's service with the State.

§9.23 (a) The unremarried spouse and otherwise eligible dependent children of an employee, who retires after April 1, 1979, with ten or more years of active State service and subsequently dies, shall be permitted to continue coverage in the health insurance program with payment at the same contribution rates as required of active employees for the same coverage.

(b) The unremarried spouse and otherwise eligible dependent children of an active employee, who dies after April 1, 1979 and who, at the date of death, was vested in the Employees' Retirement System and who

48

P 002689

was at least 45 years of age and was within 10 years of the minimum retirement age shall be permitted to continue coverage in the health insurance program with payment at the same contribution rates as required of active employees for the same coverage.

§9.24 (a) Employees covered by the State Health Insurance Plan have the right to retain health insurance after retirement upon completion of ten years of service. However, in recognition of the forthcoming changes to the Government Accounting Standards Board (GASB) requirements, both the State and CSEA recognize the need to address the inequity of providing employees who serve the minimum amount of time necessary for health insurance in retirement with the same benefits as career employees. Prior to the expiration of this contract CSEA and the State shall, through the Joint Committee process, develop a proposal to modify the manner in which employer contributions to retiree premiums are calculated.

(b) An employee who is eligible to continue health insurance coverage upon retirement is entitled to a sick leave credit to be used to defray any employee contribution toward the cost of the premium. The basic monthly value of the sick leave credit shall be calculated according to the procedures in use on March 31, 1999. However, employees retiring on or after January 1, 1989 may elect an alternative method of applying the basic monthly value of the sick leave credit. Employees selecting the basic sick leave credit may elect to apply up to 100% of the calculated basic monthly value of the credit towards defraying the required contribution to the monthly premium during their own lifetime. If employees who elect that method predecease their eligible covered dependents,

49

the dependents may continue to be covered, but must pay the applicable dependent survivor share of the premium. Employees selecting the alternative method may elect to apply only up to 70% of the calculated basic monthly value of the credit toward the monthly premium during their own lifetime. Upon the death of the employee, however, any eligible surviving dependents may also apply up to 70% of the basic monthly value of the sick leave credit toward the dependent survivor share of the monthly premium for the duration of the dependents' eligibility. The State has the right to make prospective changes to the percentage of credit to be available under this alternative method for future retirees as required to maintain the cost neutrality of this feature of the plan. The selection of the method of sick leave credit application must be made at the time of retirement, and is irrevocable. In the absence of a selection by the employee, the basic method shall be applied.

§9.25 An employee retiring from State service may delay commencement or        suspend his/her retiree health coverage and the use of the employee's sick leave conversion credits indefinitely, provided that the employee applies for the delay or suspension, and furnishes proof of continued coverage under the health care plan of the employee's spouse, or from post retirement employment.

**§9.26 Joint Committee on Health Benefits**

(a) The State and CSEA agree to continue the Joint Committee on Health Benefits.

(b) The State shall seek the appropriation of funds by the Legislature to support committee initiatives and to carry out the administrative responsibilities of the Joint Committee in the amount indicated for each year

50

P 002691

of the Agreement: $700,000 in 1999-2000, $800,000 in 2000-2001, $850,000 in 2001-2002, and $900,000 in 2002-2003.

(c) The Joint Committee on Health Benefits shall work with appropriate State agencies to make mutually agreed upon changes in the Plan benefit structure through such initiatives as:

(1) The annual HMO Review Process.

(2) The ongoing review and oversight of the Managed Mental Health and Substance Abuse Treatment Program.

(3) The ongoing review and oversight of the Managed Physical Medicine Program.

(4) The continuation of the Benefits Management Program, and annual review of the list of procedures requiring Prospective Procedure Review.

(5) The Joint Committee on Health Benefits will work with the State and medical carrier to solicit and contract with credentialed radiological providers to provide mammography screening, according to the American Cancer Society's medical protocols, at the worksite and/or predetermined location. Reimbursement will be provided in accordance with the participating provider program, subject to the diagnostic copayment.

(6) The continuation of the ambulatory surgery benefit and monitoring of participating centers. The Joint Committee on Health Benefits will work with the State to oversee the solicitation by the medical/surgical/basic medical carrier of Ambulatory Surgical Centers in bordering states and in those states where retirees commonly reside.

(7) The continuation of the Home Care Advocacy

51

P 002692

Program (HCAP) and the ongoing review of services offered.

(8) The Joint Committee on Health Benefits will continue to review the impact of Domestic Partner coverage.

(d) The Joint Committee's area of review and counsel shall include but not be limited to the following areas:

(1) Development of health benefit communication programs related to the consumption of health care services provided under the Plan.

(2) The Joint Committee on Health Benefits will work with the State and Empire Plan carriers to address the need to consolidate the various telephonic requirements enrollees must adhere to and other plan resources to which enrollees have access. Effective as soon as practicable, there will be a centralized telephone number which, in turn, will direct calls to the appropriate program/benefit administrator for benefit approval, referral and/or assistance.

(3) Development, as appropriate in conjunction with the carriers, of revised benefit booklets, descriptive literature and claim forms.

(4) The CSEA Joint Committee on Health Benefits will work with the State to develop a "report card" which will include objective quality data to assist employees in selecting the health benefit plan that best meets the needs for the employee and their dependents.

(5) In cooperation with the State, the Joint Committee on Health Benefits will review the feasibility of providing employees with an Annual Health Insurance Buy-out.

52

P 002693

(6) The Joint Committee on Health Benefits will work with the State to study the feasibility of an inclusive statewide "carve-out" program for prescription drugs.

(e) The Joint Committee shall work with appropriate State agencies to review and oversee the various health plans available to employees represented by CSEA.

(f) The Joint Committee on Health Benefits shall work with appropriate State agencies to monitor future employer and employee health plan cost adjustments.

(g) The Joint Committee shall be provided with each carrier rate renewal request upon submission and be briefed in detail periodically on the status of the development of each rate renewal.

(h) The State shall require that the insurance carriers for the State Health Insurance Plan submit claims and experience data reports directly to the Joint Committee on Health Benefits in the format and with such frequency as the Committee shall determine.

(i) The Joint Committee will be responsible for the annual review of participating providers. The Joint Committee shall investigate and where feasible, take appropriate action to recruit additional providers in geographic and specialty areas determined by the Committee to be deficient.

(j) The Joint Committee shall continue to sponsor the agency health insurance administrator training program.

(k) The Joint Committee shall study recurring subscriber complaints and make recommendations for the resolution of such complaints.

(l) The Joint Committee on Health Benefits shall meet within 14 days after a request to meet has been made by either side.

53

P 002694

(m) The Joint Committee shall study and address other issues and concerns brought to the attention of the Committee that impact the accessibility, quality and costs of health care for employees covered by this Agreement.

§9.27 Appropriate descriptive material relating to any changes in benefits shall be distributed to each State agency for internal distribution prior to the effective date of the change in benefit. The State shall take all steps necessary to provide revised health insurance booklets to every employee as soon as possible. The Joint Committee on Health Benefits shall provide review and counsel on the development of the revised booklets.

§9.28 The confidentiality of individual subscriber claims shall not be violated. Except as required to conduct financial and claims processing audits of carriers and coordination of benefit provisions, specific individual claims data, reports or summaries shall not be released by the carrier to any party without the written consent of the individual, insured employee or covered dependent.

## ARTICLE 10
### Attendance and Leave
#### §10.1 Holiday Observance

(a) An employee who is entitled to time off with pay on days observed as holidays by the State as an employer shall be granted compensatory time off when any such holiday falls on a Saturday; provided, however, that employees scheduled or directed to work on any such Saturday may receive additional compensation in lieu of such compensatory time off in accordance with Section 7.17 of this Agreement. The State

54

P 002695

od not less than 60 days and for such additional period as may be determined by the Department of Civil Service, except that in no event shall such 60-day period extend the life of any eligible list beyond the statutory limit of four years.

## ARTICLE 49
### Printing of Agreement

The Civil Service Employees Association shall cause this Agreement to be printed and shall furnish the State with a sufficient number of copies for its use. The State agrees to provide each employee initially appointed on or after the date of this Agreement a copy thereof as soon as practicable following the employee's first day of work. The cost of printing this Agreement shall be shared equally by the State and CSEA.

## ARTICLE 50
### Conclusion of Collective Negotiations

This Agreement is the entire agreement between the State and CSEA, terminates all prior agreements and understandings and concludes all collective negotiations during its term. During the term of this Agreement, neither party will unilaterally seek to modify its terms through legislation or any other means. The parties agree to support jointly any legislation or administrative action necessary to implement the provisions of this Agreement. The parties acknowledge that, except as otherwise expressly provided herein, they have fully negotiated with respect to the terms and conditions of employment and have settled them for the term of this Agreement in accordance with the provisions thereof.

154

P 002795

**ARTICLE 51**
**Severability**

In the event that any article, section or portion of this Agreement is found to be invalid by a decision of a tribunal of competent jurisdiction or shall have the effect of loss to the State of funds made available through Federal law, then such specific article, section or portion specified in such decision or having such effect shall be of no force and effect, but the remainder of this Agreement shall continue in full force and effect. Upon the issuance of such a decision or the issuance of a ruling having such effect of loss of Federal funds, then either party shall have the right immediately to reopen negotiations with respect to a substitute for such article, section or portion of this Agreement involved. The parties agree to use their best efforts to contest any such loss of Federal funds which may be threatened. In the event that the Legislature fails to implement Section 7.1, any or all articles may be reopened at the option of CSEA or the State, and renegotiated. In the event that any other article, section or portion of this Agreement fails to be implemented by the Legislature, then in that event, such article, section or portion may be reopened by CSEA or the State and renegotiated. During the course of any reopened negotiations any provision of this Agreement not affected by such reopener shall remain in full force and effect.

155

P 002796

## ARTICLE 52
## APPROVAL OF THE LEGISLATURE

IT IS AGREED BY AND BETWEEN THE PAR-
TIES THAT ANY PROVISION OF THIS AGREE-
MENT REQUIRING LEGISLATIVE ACTION TO
PERMIT ITS IMPLEMENTATION BY AMEND-
MENT OF LAW OR BY PROVIDING THE ADDI-
TIONAL FUNDS THEREFORE, SHALL NOT
BECOME EFFECTIVE UNTIL THE APPROPRIATE
LEGISLATIVE BODY HAS GIVEN APPROVAL.

## ARTICLE 53
**Duration of Agreement**
The term of this Agreement shall be from April 2,
1999 to April 1, 2003.

**IN WITNESS WHEREOF**, the parties hereto have
caused this Agreement to be signed by their respective
representatives on April 15, 2000.

THE EXECUTIVE BRANCH OF THE STATE OF

P 002797

## NEW YORK

**Linda Angello**
Director of GOER

**John Currier**
Executive Deputy Director and Chief Negotiator

**Rebecca Caudle**
Assistant Director

**Walter Pellegrini**
General Counsel

**Richard J. Dautner**
Deputy Counsel

**Priscilla Feinberg**
Assistant Director, Employee Benefits Management

**Team Members:**

| | | |
|---|---|---|
| Mary Ackley | Lew Bushey | Gwen Chattman |
| Joseph Costello | Gail Curley | Deborah Dammer |
| Lou DeSol | Craig Dickinson | James Gifford |
| Walter Greenberg | Margaret Harrigan | Robert Hoffmeister |
| Michelle Kramek | Carol Kurst | Richard Martin |
| Richard McDowell | Caroline Melkonian | Lorraine Nicholas |
| Amy Petragnani | Ross Piscitelli | James Rulison |
| Judith Quaglieri | Ellen Schusterson | Alyce Siegel |
| Kathleen Sims | Onnolee Smith | Charles Thompson |
| Charles Vejvoda | Michael Volforte | Pamela Williams |
| Keith Wilson | Jeffrey Yeaw | |

157

P 002798

**THE CIVIL SERVICE EMPLOYEES ASSOCIA-
TION, INC., LOCAL 1000,
AFSCME, AFL-CIO**

**Danny Donohue**
President

**Ross D. Hanna**
Director of Contract Administration, Chief Negotiator

**James Hennerty**
Deputy Director of Contract Administration

**Mary Rubilotta**
Deputy Director of Contract Administration

**Guy Dugas**
Deputy Director of Contract Administration

**Denise Plunkett**
Staff Secretary

**Team Members:**

**Tom Moylan, Chair**
Deborah Boyd
Sharon Connor
Joseph DeMaria
Barbara DeSimone
Donna Smith
William VanGuilder

158

P 002799