**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DANNY DONOHUE, as President of the Civil Service**
**Employees Association, Inc., Local 1000, AFSCME,**
**AFL-CIO, and CIVIL SERVICE EMPLOYEES**
**ASSOCIATION, INC., LOCAL 1000, AFSCME,**
**AFL-CIO, and MILO BARLOW, THOMAS JEFFERSON,**
**CORNELIUS KENNEDY, JUDY RICHARDS, and HENRY**
**WAGONER, on behalf of themselves and certain other**
**RETIREES of the STATE OF NEW YORK formerly in the**
**CSEA BARGAINING UNITS,**

                         **Plaintiffs,**

         **vs.**                                    **1:11-CV-1530**
                                                    **(MAD/CFH)**


**THE STATE OF NEW YORK, ANDREW M. CUOMO,**
**as Governor of the State of New York,  NEW YORK**
**STATE CIVIL SERVICE DEPARTMENT, PATRICIA A.**
**HITE as Acting Commissioner, New York State Civil**
**Service Department, NEW YORK STATE CIVIL**
**SERVICE COMMISSION, CAROLINE W. AHL and**
**J. DENNIS HANRAHAN, as Commissioners of the**
**New York State Civil Service Commission, ROBERT L.**
**MEGNA, as Director of the New York State Division of**
**the Budget, THOMAS P. DiNAPOLI as Comptroller of the**
**State of New York, NEW YORK STATE AND LOCAL**
**RETIREMENT SYSTEM; JONATHAN LIPPMAN as Chief**
**Judge of the New York State Unified Court System, and the**
**NEW YORK STATE UNIFIED COURT SYSTEM,**

                         **Defendants.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**CIVIL SERVICE EMPLOYEES**              **DAREN J. RYLEWICZ, ESQ.**
**ASSOCIATION, INC.**                    **ERIC E. WILKE, ESQ.**
143 Washington Avenue                    **JENNIFER C. ZEGARELLI, ESQ.**
P.O. Box 7125, Capitol Station
Albany, New York 12224
Attorneys for Plaintiffs


**OFFICE OF THE NEW YORK**                **HELENA LYNCH, AAG**

**STATE ATTORNEY GENERAL**     **RICHARD LOMBARDO, AAG**
The Capitol
Albany, New York 12224
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

In their second amended complaint dated July 29, 2014, Plaintiffs seek declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and money damages, to redress Defendants' alleged deprivation of Plaintiffs' rights secured pursuant to the Contracts Clause of the United States Constitution, the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, Article I, § 6 of the New York State Constitution, and for breach of contract, and violation of New York State Civil Service Law § 167, resulting from Defendants' unilateral action effective October 1, 2011, increasing the contribution rates that Plaintiffs pay for their retiree health insurance. *See* Dkt. No. 55 at ¶ 1. Plaintiffs further seek an order declaring Chapter 491 of the Laws of 2011, amending Civil Service Law § 167(8), unconstitutional, as applied, and enjoining Defendants' implementation thereof, to the extent that said law and any regulations adopted thereunder impermissibly impair the obligation of the contract between the State and individual Plaintiffs, and the class they represent, by increasing the contribution rates that such retirees are required to pay for health insurance benefits in retirement. *See id.* at ¶ 2.

Currently before the Court are the parties' cross motions for summary judgment. *See* Dkt. Nos. 93 & 98.[1]

## II. BACKGROUND

---

[1] To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

**A.    The Parties**

Plaintiff Danny Donohue is the statewide president of the Civil Service Employees Association, Inc. ("CSEA").  *See* Dkt. No. 98 at ¶ 1.  Plaintiff CSEA is the collective negotiating representative for New York State employees in the Administrative Service Unit ("ASU"), Institutional Services Unit ("ISU"), Operational Services Unit ("OSU"), and Division of Military and Naval Affairs Unit ("DMNA"), as well as one unit of employees of the New York State Unified Court System.  *See id.* at ¶ 2.  Plaintiff Milo Barlow is a retired former member of the OSU and is receiving individual health insurance coverage.  *See id.* at ¶ 3.  Plaintiff Thomas Jefferson is a retired former employee of the Unified Court System who receives dependent coverage.  *See id.* at ¶ 4.  Plaintiff Cornelius Kennedy is a retired former member of the DMNA unit and receives dependent health insurance coverage.  *See id.* at ¶ 5.  Plaintiff Judy Richards is a retired former ASU member and receives dependent health insurance benefits.  *See id.* at ¶ 6.  Plaintiff Henry Wagoner is a retired former member of the ASU unit and receives individual health insurance benefits.  *See id.* at ¶ 7.

Defendant Andrew Cuomo is Governor of the State of New York.  *See id.* at ¶ 8.  Defendant Patricia A. Hite was, in 2011, Acting Commissioner of the New York State Department of Civil Service.  *See id.* at ¶ 9.[2]  Defendants Caroline W. Ahl and Dennis Hanrahan

_____

[2] Throughout their response to Defendants' Statement of Material Facts, Plaintiffs "[d]eny that Defendant Patricia A. Hite was the Acting Commissioner of the New York State Department of Civil Service as she failed to file, with the Department of State, a Public Officer Oath/Affirmation for such capacity."  *See, e.g.*, Dkt. No. 98 at ¶¶ 9, 47, 50 (citing Dkt. No. 93-24).  In support of this position, Plaintiffs cite to a form entitled "DESIGNATION OF DEPUTY" in which the outgoing Commissioner of the New York State Department of Civil Service, Nancy Groenwegen, designated Patricia Hite to serve as Acting Commissioner upon her departure.  *See* Dkt. No. 93-24 at 2.  The following page is a document entitled "PUBLIC OFFICER OATH/AFFIRMATION" signed by Patricia Hite.  *See id.* at 3.  Both documents were filed with the New York Department of State on December 22, 2010.  *See id.* at 2-3.  Aside from citing to

(continued...)

were, in 2011, the members of the Civil Service Commission. *See id.* at ¶ 10. Defendant Robert

Megna was, in 2011, the Director of the New York State Division of Budget. *See id.* at ¶ 11.

Defendant Thomas P. DiNapoli is the Comptroller of the State of New York. *See id.* at ¶ 12.

Finally, Defendant Jonathan Lippman was at the relevant time the Chief Judge of the Unified

Court System. *See id.* at ¶ 13.

**B.    Collective Bargaining Agreement Negotiated Between the State and CSEA in 2011**

On June 22, 2011, the Governor issued a press release announcing that the State had

reached a five-year labor agreement (the "2011-16 CBA") with the CSEA. *See* Dkt. No. 98 at ¶

14.  The press release announced a two percent increase in the premium contribution rate for

Grade 9 employees and below, and a six percent increase for Grade 10 and above. *See id.*

The 2011-16 CBA between CSEA and the State was signed on August 15, 2011, and

covered the periods between April 2, 2011 and April 1, 2016. *See id.* at ¶ 15. Section 9.14 of the

2011-16 CBA provides as follows:

> The State agrees to pay 90 percent of the cost of individual
> coverage and 75 percent of the cost of dependent coverage toward
> the hospital/medical/mental health and substance abuse components
> provided under the Empire Plan.  Effective October 1, 2011 for
> employees in a title Salary Grade 9 or below, the State agrees to pay
> 88 percent of the cost of individual coverage and 73 percent of the
> cost of dependent coverage toward the hospital/medical/mental
> health and substance abuse components provided under the Empire
> Plan.  Effective October 1, 2011 for employees in a title Salary
> Grade 10 and above or an employee equated to a position title
> Salary Grade 10 and above the State agrees to pay 84 percent of the
> cost of individual coverage and 69 percent of the cost of dependent

---

[2](...continued)

this document, Plaintiffs fail to provide any coherent argument why Plaintiff Hite was not
actually the Acting Commissioner upon Nancy Groenwegen's departure.  In fact, the designation
of Defendant Hite as acting commissioner appears to have occurred in compliance with the
relevant state procedures. *See* N.Y. Pub. Off. Law § 9.

coverage toward the hospital/medical/mental health and substance
abuse components provided under the Empire Plan.

*Id.* at ¶ 16.[3]  Section 9.1(a) of the 2011-16 CBA further states that "[t]he State shall continue to

provide all the forms and extent of coverage as defined by the contracts in force on March 31,

2011 with the State's health insurance carriers unless specifically modified by this Agreement."

*Id.* at ¶ 17.  The parties agree that the "contracts in force on March 31, 2011 with the State's

health insurance carriers" refers to the contracts between the State and the health and dental

insurance carriers.  *See id.* at ¶ 18.  According to Defendants, none of the contracts between the

State and any insurance carriers, including those in force on March 31, 2011, contained any

provisions setting forth the respective premium contribution rates for the State and its employees.

*See* Dkt. No. 93-2 at ¶ 19; Dkt. No. 98 at ¶ 19.

Section 9.26 of the 2011-16 CBA provides that "[t]he unremarried spouse and otherwise

eligible dependent children of an employee, who retires after April 1, 1979, with ten or more

years of active State service and subsequently dies, shall be permitted to continue coverage in the

health insurance program with payment at the same contribution rates as required of active

employees for the same coverage."  Dkt. No. 98 at ¶ 20.  Article 50 of the 2011-16 CBA, entitled

"Conclusion of Collective Negotiations," provides that

> [t]his Agreement is the entire agreement between the State and
> CSEA, terminates all prior agreements and understandings and
> concludes all collective negotiations during its term.  During the
> term of this Agreement, neither party will unilaterally seek to
> modify its terms through legislation or other means.  The parties

---

[3] Plaintiffs deny this statement "to the extent that there is a reference to a single collective
bargaining agreement" but then acknowledge that the "CSEA and the State are parties to the
ASU, OSU, ISU and DMNA collective bargaining agreements that contain the identical provision
in Section 9.14 of each respective agreement."  Dkt. No. 98 at ¶ 16.  Plaintiffs make the same
objection each time Defendants provide a citation to a single CBA, yet always acknowledge that
identical language is contained in each of the omitted CBAs.  *See, e.g.*, *id.* at ¶¶ 17, 20-21.

agree to support jointly any legislation or administrative action necessary to implement the provisions of this Agreement. The parties acknowledge that, except as otherwise expressly provided herein, they have fully negotiated with respect to the terms and conditions of employment and have settled them for the term of this Agreement in accordance with the provisions thereof.

*Id.* at ¶ 21.[4]

## C. 2011 Legislation to Implement Contribution Rate Changes for Health Insurance Premiums

Prior to 2011, section 167(8) of the Civil Service Law provided, in relevant part, that the "state cost of premium or subscription charges for eligible employees" covered by a CBA "may be increased to the terms of such agreement." Dkt. No. 98 at ¶ 22 (citing Senate Bill 5846, Assembly Bill 8513). On August 17, 2011, section 167(8) was amended to read as follows:

> Notwithstanding any inconsistent provision of law, where and to the extent that an agreement between the state and an employee organization entered into pursuant to article fourteen of this chapter so provides, the state cost of premium or subscription charges for eligible employees covered by such agreement may be modified pursuant to the terms of such agreement. The president, with the approval of the director of the budget, may extend the modified state cost of premium or subscription charges for employees or retirees not subject to an agreement referenced above and shall promulgate the necessary rules or regulations to implement this provision.

*Id.* at ¶ 23. Defendants contend that "[s]ection 167(8) was amended to implement the collectively bargained provisions of the CSEA 2011-16 CBA relating to health insurance contributions." Dkt. No. 93-2 at ¶ 24. Plaintiffs, however, assert that "the parties never agreed to change retiree health insurance contributions as part of collective bargaining, despite the State's proposals to change the

---

[4] The Court notes that this language is contained in Article 50 of the ASU agreement, Article 54 of the OSU agreement, Article 55 of the ISU agreement, and Article 43 of the DMNA agreement. *See* Dkt. No. 98 at ¶ 21.

level of premium contribution rates to a sliding scale based upon number of years of employment during the 1991-1995, 2003-2007 and 2007-2011 rounds of negotiations."  Dkt. No. 98 at ¶ 24.

**D.      Collective Bargaining Agreements Between the State and CSEA from 1982 to 2011**

Section 9.1(a) of the CBA in effect from 2007 to 2011 (the "2007-11 CBA") stated that "[t]he State shall continue to provide all the forms and extent of coverage as defined by the contracts in force on March 31, 2007, with the State's health insurance carriers unless specifically modified by this Agreement."  Dkt. No. 98 at ¶ 25.  As with the 2007-11 CBA, the 2003-07 CBA, 1999-03 CBA, 1995-99 CBA, 1991-95 CBA, 1988-91 CBA, 1985-88 CBA, and 1982-85 CBA all contained this language regarding the forms and extent of coverage.  *See id.* at ¶¶ 27-39.  None of the contracts between the State and health and dental insurance carriers, including those in force between 1982 and 2011, contains or contained any provision setting forth the respective premium contribution rates of the State and employees.  *See id.* at ¶ 41.

The 2007-11 CBA, 2003-07 CBA, 1999-03 CBA, 1995-99 CBA, 1991-95 CBA, 1988-91 CBA, and 1985-88 CBA all provided that the State paid 90 percent of the cost of the premium for individual coverage and 75 percent of the cost of the premium for dependent coverage for the Empire Plan and HMOs.  *See* Dkt. No. 98 at ¶ 42.  The 1982-85 CBA provided that the State paid 100% of employee premiums and 75 % of the cost of dependent coverage.  *See id.* at ¶ 43.  The 2007-11 CBA, 2003-07 CBA, 1999-03 CBA, 1995-99 CBA, 1991-95 CBA, 1988-91 CBA, 1985-88 CBA, and 1982-85 CBA provided that "[t]he unmarried spouse of an employee, who retires after April 1, 1979, with ten or more years of active State service and subsequently dies, shall be permitted to continue coverage in the health insurance program with payment at the same contribution rates as required of active employees."  *Id.* at ¶ 44.

**E.      Administrative Measures in 2011 Regarding Contribution Rates for Employee Health Insurance Premiums**

By letter dated September 21, 2011, Defendant Hite notified Defendant Megna that she was extending, as authorized by Civil Service Law § 167(8), and subject to his approval, the modified State premium contribution rates set forth in Article 9 of the 2011-16 CSEA CBA, to unrepresented employees and retirees.  *See* Dkt. No. 98 at ¶ 45.[5]  The letter was signed by Defendant Megna on September 22, 2011.  *See id.* at ¶ 46.

On September 27, 2011, Defendant Hite adopted a Resolution, citing to the authority vested in her in Civil Service Law sections 160(1), 161-a, and 167(8), which amended section 73.3(b) of Title 4 of the New York Code of Rules and Regulations.  *See* Dkt. No. 93-2 at ¶ 47 (citing Dkt. No. 93-21); *see also* Dkt. No. 98 at ¶ 47.  The Resolution contained the following provisions applicable to retirees:

> (i) for retirees who retired on or after January 1, 1983, and employees retiring prior to January 1, 2012, New York State shall contribute 88 percent of the charge on account of individual coverage and 73 percent of the charge on account of dependent coverage, provided, however, that for hospital/medical/mental health and substance abuse coverage provided under a Health Maintenance Organization, the State's rate of contribution shall not exceed 100 percent of its dollar contribution for such coverage under the Empire Plan;

> (ii) for employees retiring on or after January 1, 2012, from a title allocated or equated to salary grade 9 or below, New York State shall contribute 88 percent of the charge on account of individual coverage and 73 percent of the charge on account of dependent coverage, provided, however, that for hospital/medical/mental health and substance abuse coverage provided under a Health Maintenance Organization, the State's rate of contribution shall not exceed 100 percent of its dollar contribution for such coverage under the Empire Plan;

---

[5] While Plaintiffs generally admit the content of Defendant Hite's September 21, 2011 letter, they deny that the State was authorized to modify the premium contribution rates for retirees.  *See* Dkt. No. 98 at ¶ 45.

> (iii) for employees retiring on or after January 1, 2012, from a title allocated or equated to salary grade 10 or above, New York State shall contribute 84 percent of the charge on account of individual coverage and 69 percent of the charge on account of dependent coverage, provided, however, that for hospital/medical/mental health and substance abuse coverage provided under a Health Maintenance Organization, the State's rate of contribution shall not exceed 100 percent of its dollar contribution for such coverage under the Empire Plan.

Dkt. No. 98 at ¶ 48; *see also* Dkt. No. 93-21 at 2-3 (emphasis omitted). The foregoing provisions were made effective October 1, 2011. *See id.* at ¶ 49. Defendant Hite also certified the necessity of adopting the proposed amendments on an emergency basis. *See id.* at ¶ 50.

## F. Chapter 14 of the Laws of 1983

In 1983, Civil Service Law § 167(8) was modified to provide that the full cost of health insurance premiums would be paid by the State for those who retired prior to January 1, 1983. *See* Dkt. No. 98 at ¶ 51; *see also* Dkt. No. 93-23. The 1983 law further provided that nine-tenths of the premium charge for health insurance would be paid by the State for current employees and those who retire on or after January 1, 1983. *See id.* at ¶ 52. The 1983 law was enacted to implement agreements reached through collectively bargaining, including an express agreement that the State would continue to pay 100% of the health insurance premium contributions for those who retired prior to January 1, 1983. *See id.* at ¶ 53.

## G. Fiscal Crisis Facing the State in 2010-2011

As a result of the Great Recession that began in December 2007 according to the National Bureau of Economic Research, the State faced General Fund budget gaps for Fiscal Year 2009-2010, 2010-2011, and 2011-2012 in the amounts of $17.9 billion (2 percent of estimated spending), $9.2 billion (15 percent of estimated spending), and $10 billion (15 percent of estimated spending), respectively. *See* Dkt. No. 98 at ¶ 54. A General Fund budget gap means

the difference between planning spending commitments and the receipts available to pay them. *See id.* at ¶ 55. State law requires the Governor to submit and the Legislature to enact an annual General Fund budget that is balanced. *See id.* at ¶ 56. The State balances the General Fund budget using the cash basis of accounting. *See id.*

In Fiscal Years 2009-10, 2010-11, and 2011-12, the State was required to adopt a range of measures to close the large budget gaps and achieve a balanced budget. *See id.* at ¶ 57. The measures adopted in these years touched on a range of State activities, including: reductions in State payments for public schools, health care providers, local governments, social services and other services; imposition of cost controls on the operations of State agencies; increases in tax revenues, including personal income taxes, sales taxes, and other taxes; the deferral of required payments to the State pension system; and the use of non-recurring resources. *See id.* In Fiscal Year 2011-12, which is the Fiscal Year during which the changes to cost-sharing for health insurance premiums were approved, the State enacted a gap-closing plan to eliminate the $10 billion budget gap. *See id.* at ¶ 58. The Fiscal Year 2011-12 gap-closing plan consisted of a range of measures to moderate spending growth and increase receipts. *See id.* at ¶ 59. The gap closing plan for Fiscal Year 2011-12 authorized actions to lower spending by approximately $8.5 billion, which represented 85% of the gap-closing plan. *See id.* at ¶ 60. Actions to lower spending included reductions of: $2.8 billion for education aid; $2.7 billion for Medicaid; $1.5 billion for State agency operations; and $1.6 billion for various other programs and activities. *See id.* at ¶ 61. The gap-closing plan also included approximately $860 million in actions that the New York State Division of the Budget ("DOB") characterized as non-recurring, including the use of certain fund balances and resources made available from state public authorities, as well as $324 million in increased revenues. *See id.* at ¶ 62.

The development of the annual budget follows a methodical process.  *See id.* at ¶ 63.

DOB evaluates the anticipated fiscal position of the State for the upcoming Fiscal Year and

establishes savings targets for each area of the budget that it estimates must be achieved for the

State to enact a balanced budget.  *See id.*  In setting savings targets, the many factors that DOB

considers and weighs include service needs and trends, fiscal and policy priorities, legal and

administrative constraints, economic effects, and feasibility of enactment.  *See id.* at ¶ 64.  DOB

analysts develop specific proposals intended to achieve the fiscal targets.  *See id.* at ¶ 65.  Those

proposals are researched and documented for discussion with senior management.  *See id.*  The

budget proposals are then reviewed by the Director of the Budget.  *See id.*  A package of

recommended proposals is then submitted to the Governor for consideration.  *See id.*  The final

package of proposals approved by the Governor is embodied in the Executive Budget.  *See id.*

The gap-closing plan that was proposed in the 2011-12 Executive Budget was approved

by the Legislature with relatively few modifications.  *See id.* at ¶ 66.  The plan struck a balance

among the constituencies that rely on the State and allocated savings across a range of activities.

*See id.* at ¶ 67.  The savings from the redesign of State agency operations came from several

sources, including facility closures, operational efficiencies, and wage and benefit changes.  *See*

*id.* at ¶ 68.  The reductions from State agency operations were expected to provide savings of $1.5

billion compared with the then current forecast.  *See id.* at ¶ 69.  Some of the savings from agency

operations were expected to be achieved by negotiated changes, and if negotiations were not

successful, significant layoffs would have been necessary.  *See id.* at ¶ 70.

In balancing the budget for a given year, the State weighs the impact of gap-closing

actions on its long-term operating position.  *See* Dkt. No. 98 at ¶ 71.  DOB typically develops the

Financial Plan with a goal of achieving a reasonably close relationship between receipts and

disbursements over multi-year period. *See id.* It is more difficult to maintain year-to-year spending levels and commitments in an environment of persistent large budget gaps. *See id.* The out-year budget gaps (*i.e.*, the budget gaps projected for the three subsequent fiscal years) are a measure of fiscal stress taken into account by the credit rating agencies. *See id.* at ¶ 72. In Fiscal Year 2011-12, the out-year budget gaps, before accounting for the gap-closing measures approved in the 2011-12 Enacted Budget, were projected at $14.9 billion for Fiscal Year 2012-13; $17.4 billion for Fiscal Year 2013-14; and $20.9 billion for Fiscal Year 2014-15. *See id.* at ¶ 73. The Enacted Budget for Fiscal Year 2011-12 reduced those projections to $2.4 billion, $2.8 billion, and $4.6 billion, respectively. *See id.* at ¶ 74. The 2011-12 gap-closing plan affected a wide range of State activities, including agency operations, to bring the projected receipts and disbursements into closer alignment over the multi-year Financial Plan. *See id.* at ¶ 75.

The State's credit rating depends in part on its ability to maintain budget balance in the current year and to keep budget gaps projected for future years within a manageable range. *See id.* at ¶ 76. A lower credit rating may make it more costly for the State to borrow money. *See id.* The ratings agencies cited the reduced out-year budget gaps when they upgraded the State's general obligation credit rating in 2014. *See id.* at ¶ 77.

As part of the response to the Great Recession, all State agencies were asked by the Governor's Office to advance proposals designed to achieve workforce savings. *See id.* at ¶ 78. Accordingly, the Department of Civil Service (the "Department") was asked to provide proposals. *See id.* At the Department, many proposals were discussed, including changes to NYSHIP. *See id.* One proposal to reduce the costs of NYSHIP, while avoiding reductions in plan benefits for State employees and retirees, was to decrease the State's contribution to health insurance

premiums.  *See id.* at ¶ 79.[6]  This proposal allowed for savings to be achieved within NYSHIP, while allowing for the overall design and generous benefits of the plan to be maintained, at a minimal additional cost to employees and retirees.  *See id.* at ¶ 80.

## H.    Defendant Hite Acting as Head of the Department of Civil Service

By the document entitled "Designation of Deputy," dated December 22, 2010, Nancy Groenwegen, then the Commissioner and head of the New York State Department of Civil Service, designated certain persons as deputies, who would act in her absence as the head of the New York State Department of Civil Service.  *See* Dkt. No. 98 at ¶ 81.  Defendant Hite was the first deputy so designated by Nancy Groenwegen.  *See id.* at ¶ 83.  The designation was filed with the Department of State on December 22, 2010 and Nancy Groenwegen resigned her position that same day.  *See id.* at ¶¶ 82, 84.

According to Defendants, upon Ms. Groenwegen's resignation, Defendant Hite became the Acting Commissioner of the Department of Civil Service.  *See* Dkt. No. 93-2 at ¶ 85. Plaintiffs, however, contend that "Defendant Hite was designated as a Deputy so long as she held the position of Director Division of Classification and Compensation. . . .  Further, Defendant Hite was never appointed as Acting Commissioner by Governor Cuomo and never filed a Public Officer Oath/Affirmation in the position of Acting Commissioner."  Dkt. No. 98 at ¶ 85 (citing

---

[6] The Court notes that, while Plaintiffs admit this statement, they "assert that the change to health insurance premium contribution levels for current employees represented by CSEA was negotiated, while there were no such negotiations on behalf of retirees entitled to the premium contribution levels pursuant to the collective bargaining agreements in effect between January 1, 1983 and October 1, 2011."  Dkt. No. 98 at ¶ 79 (citing Hanna Decl., ¶¶ 37-41).  Plaintiff further "assert that the State's chief negotiator did not consider cost savings when he advanced the issue to raise the premium contribution rates of individuals already retired."  *Id.* (citing Bress Depo. pp. 79-80, 82).

Hite Depo. pp. 21-22; Lynch Decl., Exh. 16).[7] As Acting Commissioner of the Department, Defendant Hite was not a member of the Civil Service Commission. *See id.* at ¶ 86. Defendants claim that Hite served as Acting Commissioner until Ms. Groenwegen's successor was appointed in September 2012. *See* Dkt. No. 93-2 at ¶ 87.

Defendants claim that, as Acting Commissioner, Defendant Hite ran the Department, making all executive decisions on behalf of the agency, including those related to the NYSHIP, and overseeing all Department Divisions, including the Division of Employee Benefits, which is responsible for the administration of the NYSHIP. *See id.* at ¶ 88. During her tenure as Acting Commissioner, in response to a request by the Governor's office for proposals to achieve workforce savings, the Department considered many proposals, and eventually proposed reducing the State's contribution to the NYSHIP health insurance premiums. *See id.* at ¶ 89. Defendants claim that the purpose of the proposal was to allow for savings, while maintaining the overall design and rich benefits of the NYSHIP at a minimal cost to employees and retirees. *See* Dkt. No. 93-2 at ¶ 90.

By letter dated September 21, 2011, Defendant Hite notified Defendant Megna that she would extend, as authorized by Civil Service Law § 167(8), and subject to his approval, the modified State premium contribution rates set forth in Article 9 of the 2011-16 CBA to unrepresented employees and retirees. *See id.* at ¶ 91; *see also* Dkt. No. 98 at ¶ 91. Moreover, Defendants claim that Defendant Hite also adopted, pursuant to the authority vested in her by Civil Service Law §§ 160(1), 161-a, and 167(8), a Resolution dated September 27, 2011,

---

[7] The Court notes that Plaintiffs object to any statement of fact regarding Defendant Hite on these same grounds.

amending Section 73.3(b) of Title 4 of the New York Code of Rules and Regulations, as set forth in more detail above. *See id.* at ¶ 92.

## I.        The Complaint and Pending Motions for Summary Judgment

In their first cause of action, Plaintiffs allege that the increase in the percentage of the health insurance premium contribution paid by retirees violated the Contracts Clause of Article I, § 10 of the United States Constitution. *See* Dkt. No. 55 at ¶¶ 79-95. Defendants contend that the Court should dismiss this cause of action because the collective bargaining agreements do not establish a contractual right to a perpetually fixed health insurance premium contribution rates. *See* Dkt. No. 93-1 at 11-16. Further, Defendants argue that, even if Plaintiffs do have a vested right to a perpetually fixed premium contribution rate, they failed to demonstrate a substantial impairment of that right. *See id.* at 16-19. Moreover, Defendants contend that they are entitled to summary judgment on this claim because the law at issue served a legitimate public purpose and the means chosen to accomplish that purpose were reasonable and necessary. *See id.* at 19-23.

In their second cause of action, Plaintiffs allege that the increase in the percentage of the health insurance premium contribution paid by retirees breached Plaintiffs' contractual rights under the 2007-11 CBA. *See* Dkt. No. 55 at ¶¶ 96-105. Defendants contend that the Court should decline to exercise supplemental jurisdiction over this claim since there is no viable federal claim and that this claim should otherwise be dismissed because it lacks merit. *See* Dkt. No. 93-1 at 23-25.

The third and fifth causes of action allege that the retirees' premium contribution increase violated Plaintiffs' right to due process under the Federal and State Constitutions. *See* Dkt. No. 55 at ¶¶ 106-15, 132-40. Defendants argue that these claims fail because Plaintiffs do not have a property interest in a perpetually fixed premium contribution rate and the New York State

Constitution does not provide for the cause of action Plaintiffs assert. *See* Dkt. No. 93-1 at 26-29, 32-34. Additionally, Defendants contend that, even if Plaintiffs had a property interest, the claim still fails because they had an adequate state-court remedy of which they failed to avail themselves. *See id.* at 30-32.

The fourth cause of action alleges that Defendant Hite lacked the authority to administratively extend the premium shift. *See* Dkt. No. 55 at ¶¶ 116-31. Defendants claim that this cause of action "appears to have been brought pursuant to Article 78 of the New York Civil Practice Law and Rules and has been dismissed." Dkt. No. 93-1 at 9 (citing Dkt. No. 19 at 19-22).

In their sixth cause of action, Plaintiffs allege that Defendants Hite and Megna violated Article III, § 1 of the New York State Constitution. *See* Dkt. No. 55 at ¶¶ 141-45. Defendants argue that the Court should decline to exercise supplemental jurisdiction over this state law claim which, in any event, has no merit because Defendants Hite and Megna acted in accordance with the express terms of Civil Service Law § 167(8). *See* Dkt. No. 93-1 at 34-35.

The seventh cause of action purports to be a separate cause of action under 42 U.S.C. § 1983.[8] *See* Dkt. No. 55 at ¶¶ 146-49. Defendants contend that this claim is duplicative of the Contracts Clause and federal Due Process causes of action and must be dismissed. *See* Dkt. No. 93-1 at 36.

Finally, the eighth cause of action alleges that the retirees' premium contribution increase violated Plaintiffs' contract rights established by statute and longstanding practice. *See* Dkt. No. 55 at ¶¶ 150-55. Defendants argue that they are entitled to summary judgment as to this claim

---

[8] In the caption of this cause of action, Plaintiffs cite to 42 U.S.C. § 1981. In the body of this cause of action, however, Plaintiffs cite to 42 U.S.C. § 1983.

because (1) it is well established that Civil Service Law § 167(1) did not bestow any contractual rights on Plaintiffs; (2) the claimed past practice did not exist; and (3) a past practice is merely a form of parol evidence and does not independently establish a contractual right. *See* Dkt. No. 93-1 at 37-39.

## III. DISCUSSION

### A.    Standard of review

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**B.**     **First Cause of Action: Contracts Clause of the United States Constitution**

*1. Legal Framework*

"The Contracts Clause restricts the power of States to disrupt contractual arrangements.  It provides that '[n]o state shall ... pass any ... Law impairing the Obligation of Contracts.'"  *Sveen v. Melin*, ___ U.S. ___, 138 S. Ct. 1815, 1821 (2018) (quoting U.S. Const., Art. I, § 10, cl. 1). While the origins of the Clause lie in legislation enacted after the Revolutionary War to relieve debtors of their obligations to creditors, it applies to any kind of contract.  *See id.* (citations omitted).

"At the same time, not all laws affecting pre-existing contracts violate the Clause."  *Sveen*, 138 S. Ct. at 1822 (citing *El Paso v. Simmons*, 379 U.S. 497, 506-507, 85 S. Ct. 577, 13 L. Ed. 2d 446 (1965)).  To determine when such a law crosses the constitutional line, the Supreme Court has long applied a two-step test.  *See id.*  "The threshold issue is whether the state law has 'operated as a substantial impairment of a contractual relationship.'"  *Id.* at 1821-22 (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244, 98 S. Ct. 2716, 57 L. Ed. 2d 727 (1978)).  "In answering that question, the Court has considered the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Id.* at 1822 (citations omitted).  "If such factors show a substantial impairment, the inquiry turns to the means and ends of the legislation. In particular, the Court has asked whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Id.* (quoting *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411-412, 103 S. Ct. 697, 74 L. Ed. 2d 569 (1983)).

*2. Contractual Relationship*

In their motion, Defendants contend that no contractual relationship exists as to the allegedly impaired term because there is no contractual term promising the perpetual continuation of premium contribution rates at a specific level. *See* Dkt. No. 93-1 at 12-16. Plaintiffs, however, argue that they are entitled to summary judgment as to this claim because there is no dispute that the collective bargaining agreements at issue entitled retirees to health insurance "with the State paying 90% of the cost of individual coverage and 75% of the cost of dependent coverage upon the completion of 10 years of State service." *See* Dkt. No. 97-33 at 16. Plaintiffs rely primarily on two provisions of the CBAs at issue. *See id.* at 16-18. The first provision provides that "[e]mployees covered by the State Health Insurance Plan have the right to retain health insurance after retirement upon completion of ten years of service." *Id.* The second provision provides that "[t]he State agrees to pay 90 percent of the cost of individual coverage and 75 percent of the cost of dependent coverage toward the hospital/medical/mental health and substance abuse components provided under the Empire Plan." *Id.* at 16. Plaintiffs assert that this language has been contained in both clause within Section 9 of the CBAs from the 1982-85 CBA through the 2007-11 CBA. *See id.*

Generally, "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement." *Litton Financial Printing Div. v. N.L.R.B.*, 501 U.S. 190, 207 (1991) (citation omitted). "That principle does not preclude the conclusion that the parties intended to vest lifetime benefits for retirees." *M&G Polymers USA, LLC v. Tackett*, ___ U.S.___, 135 S. Ct. 926, 937 (2015). The Supreme Court has specifically "recognized that 'a collective-bargaining agreement [may] provid[e] in explicit terms that certain benefits continue after the agreement's expiration.'" *Id.* (quotation omitted). "But when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life." *Id.* The

court "must look to well established principles of contract interpretation to determine whether the parties intended that the contract give rise to a vested right." *Kolbe v. Tibbetts*, 22 N.Y.3d 344, 353 (2013); *see also Litton*, 501 U.S. at 207.

Central to the Court's analysis here is the United States Supreme Court's decision in *M & G Polymers USA, LLC v. Hobert Freel Tackett*, ___U.S.___, 135 S. Ct. 926 (2015). *Tackett* involved an open-ended CBA provision for retiree insurance benefits that the Sixth Circuit found ambiguous as to duration. *See id. at* 934. The appellate court applied the reasoning of an earlier Sixth Circuit decision, *International Union, United Auto., Aerospace & Agricultural Implement Workers of America v. Yard–Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), drawing inferences from the "context" of labor negotiations to resolve the contractual ambiguity. *Id.* at 932 (citing *Tackett v. M & G Polymers, USA, LLC (Tackett I)*, 561 F.3d 478, 490 (6th Cir. 2009)). Although the CBA contained a general durational clause, the Sixth Circuit found it "unlikely" that the employees' union would have agreed to CBA language that ensured a full company contribution if the employer could have unilaterally changed those terms. *See id.* (citing *Tackett I*, 561 F.3d at 490)). The Sixth Circuit therefore found the existence of a question of fact as to whether the retiree benefits vested for life. *See id.*

The Supreme Court disagreed. Writing for the majority, Justice Thomas stated that contractual provisions in CBAs are to be enforced as written and interpreted in accordance with "ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy." *Id.* at 933. As with any contract, "the parties' intentions control." *Id.* (citing *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682, 130 S. Ct. 1758, 176 L. Ed. 2d 605 (2010)). Where the terms of the contract are unambiguous, it is to be construed "in accordance with its plainly expressed intent." *Id.* (quoting 11 R. Lord, Williston on Contracts §

30:6, p. 108 (4th ed. 2012) (Williston)). Courts may not speculate as to the intentions of employees, unions, and employers in negotiating retiree benefits, but must ground their assessments on record evidence. *See id.* at 935. Thus, courts may consider certain known customs or industry usages to construe a contract, but "the parties must prove those customs or usages using affirmative evidentiary support in a given case." *Id.* (citing 12 Williston § 34:3).

When faced with ambiguous language, the Supreme Court advised that courts "should not construe ambiguous writings to create lifetime promises." *Id.* at 936 (citing 3 A. Corbin, Corbin on Contracts § 533, p. 216 (1960)). Rather, courts should be guided by the "traditional principle that 'contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement.'" *Id.* at 937 (quoting *Litton Fin. Printing Div., Litton Bus. Sys., Inc. v. NLRB*, 501 U.S. 190, 207, 111 S. Ct. 2215, 115 L. Ed. 2d 177 (1991)). While a CBA may explicitly provide that certain terms continue after the agreement's expiration, when a contract fails to address the duration of retiree benefits, "a court may not infer that the parties intended those benefits to vest for life." *Id.*

In her concurring opinion, Justice Ginsburg expounded upon Justice Thomas' adherence to fundamental principles of contract law, stating that when the parties' intent is unambiguously expressed in the contract, that intent controls, and the court's analysis should go no further. *See id.* at 938 (Ginsburg, J., concurring) (citing 11 R. Lord, Williston on Contracts § 30:2, p. 98–104) (4th ed. 2012) (Williston)). When faced with ambiguity, however, courts may consider extrinsic evidence to determine the parties' intentions. *See id.* (citing 11 Williston § 30:7, at 116–24). Justice Ginsburg further observed that there is no rule requiring "clear and express" language in order to demonstrate that the parties intended healthcare benefits to vest. *Id.* Rather, "'constraints upon the employer after the expiration date of a collective-bargaining agreement,' we have

observed, may be derived from the agreement's "explicit terms," but they 'may arise as well from ... implied terms of the expired agreement.'" *Id.* (alterations in original) (quoting *Litton*, 501 U.S. at 203, 207, 111 S. Ct. 2215).[9]

"Although a contract's general-durational clause does not say everything about the parties' intent to vest a benefit, *Tackett v. M & G Polymers USA, LLC*, 811 F.3d 204, 209 (6th Cir. 2016) (*Tackett III*), it certainly says a lot." *Serafino v. City of Hamtramck*, 707 Fed. Appx. 345, 352 (6th Cir. 2017). "So, '[w]hen a specific provision of the CBA does not include an end date, [the court] refer[s] to the general durational clause to determine that provision's termination.'" *Id.* (quoting *Gallo v. Moen, Inc.*, 813 F.3d 265, 269 (6th Cir. 2016)). "Absent some strong indication within the four corners of the agreement itself — perhaps, a specific-durational clause that applied to certain provisions but not others — the contractual rights and obligations under a CBA terminate along with the CBA." *Id.* (citing *Tackett*, 135 S. Ct. at 937).

With these principles in mind, in the present matter, the Court finds that the unambiguous terms of the CBAs at issue did not create a vested interest in the perpetual continuation of premium contribution rates at a specific level. Plaintiffs rely on Article 9 of CSEA's 2007-11 CBA, and substantially similar provisions of prior CBAs going back to 1983, to support their

---

[9] Of course, *Tackett* arose in a different context than the claims presented here. Specifically, those cases were brought under *ERISA*, which governs relationships and agreements between private employees and their employees but excludes public employers and employees, like Plaintiffs here. *See* 29 U.S.C. § 1003(b)(1). Thus, what rights exist under the CBAs at issue here is determined by New York contract law. Yet, despite the different setting, courts have endorsed *Tackett*'s reasoning in both the private and public-sector context. *See Serafino*, 707 Fed. Appx. at 352 (citing cases); *Baltimore City Lodge No. 3 of Fraternal Order of Police, Inc. v. Baltimore Police Dept.*, No. 1:16-cv-3309, 2017 WL 3216775 (D. Md. July 28, 2017); *Kendzierski v. Macomb County*, 901 N.W.2d 111, 114-15 (Mich. 2017); *Township of Toms River v. Fraternal Order of Police Lodge No. 156*, 2016 WL 1313174 (N.J. Sup. Ct. Mar. 16, 2016); *Harper Woods Retirees Ass'n v. City of Harper Woods*, 879 N.W.2d 897 (Mich. Ct. of App. 2015).

argument that they have a vested right to a perpetually fixed premium contribution rate for their health insurance coverage. *See, e.g.,* Dkt. No. 55 at ¶¶ 36, 43, 45, 70-71, 84, 109.

Section 9.1 of the 2007-11 CBA between CSEA and the State provides that "[t]he State shall continue to provide all the forms and extent of coverage as defined by the contracts and in force on March 31, 2007 with the State's health insurance carriers unless specifically modified by this Agreement." Dkt. No. 93-12 at 4. This language clearly indicates that the State is promising the continuation of coverage. The introductory language simply establishes that the coverage in the previous CBA, to the extent that it is defined in the contracts between the State and the insurance carriers, will continue unless altered through negotiations. Therefore, what is continued are the benefits defined in the contracts with the insurance carriers.

Additionally, to the extent that "continue" is read to mean continuation after the expiration of the CBA, the term "coverage" can only naturally be referring to the coverage that is defined in the "contracts" with "the State health and dental insurance carriers." The State promised to continue to provide "coverage," not as defined in the prior CBA, but in the State's contracts with the insurance carriers that provide coverage to State employees. As Defendants correctly note, premium contribution rates are not considered "forms and extent of coverage" under the State's Health Insurance Plan. Rather, the "forms and extent of coverage" are defined in the contracts with the health insurance carriers and those contracts do not define or set the premium contribution rates paid by the State and retirees. *See* Dkt. No. 93-2 at ¶¶ 18, 26, 28, 30, 32, 34, 36, 40-41. As such, the term "forms and extent of coverage" does not include within its scope premium contribution rates.

Also, to the extent that Plaintiffs claim that the word "contracts" in Section 9.1 refers to the CBA that was in effect on March 31, 2007, the argument must fail. First, as Defendants

correctly note, Section 9.1 plainly refers to "contracts," not a single contract.  Second, the 2007-11 CBA and its predecessors refer to themselves as the "Agreement," not the "contract."  Dkt. No. 93-2 at ¶¶ 25, 27, 29, 31, 33, 35, 37, 39.  There is no plausible reason why Section 9.1 of the 2007-11 CBA would diverge from the language that had been used for decades and refer to a prior CBA as the "the contracts" rather than the "Agreement."

Defendants also correctly note that the sections of the 2007-11 CBAs that set forth the specific premium contribution rates further support the interpretation that the CBAs do not guarantee a perpetual specific premium contribution rate.  Specifically, Section 9.23(a) provides that "[t]he unremarried spouse and otherwise eligible dependent children of an employee, who retires after April 1, 1979, with ten or more years of active State service and subsequently dies, shall be permitted to continue coverage in the health insurance program with payment at the same contribution rates as required of active employees for the same coverage."  Dkt. No. 93-12 at 21.  This provision demonstrates that, when a specific contribution rate is meant to be guaranteed into retirement, it is set forth expressly in the contract.

Plaintiffs argue that two provisions read together support their position.  Section 9.27(a) provides that "[e]mployees covered by the State Health Insurance Plan have the right to retain health insurance after retirement upon completion of ten years of service."  Dkt. No. 97-33 at 16.  Further, Section 9.14(a) provides that "[t]he State agrees to pay 90 percent of the cost of individual coverage and 75 percent of the cost of dependent coverage toward hospital/medical/mental health and substance abuse components provided under the Empire Plan."  *Id.*; *see also* Dkt. No. 93-12 at 16.  Relying on the declaration of Ross Hanna, who has been CSEA's chief negotiator for the past twenty-nine years, Plaintiffs argue that these provisions entitle a post-1983 retiree to health insurance coverage with the State paying 90% of the cost of

24

individual coverage and 75% of the cost of dependent coverage upon completion of 10 years of State service. *See id.* at 16-17. Plaintiffs, through Mr. Hanna, contend that further evidence of the parties' understanding of this language is the fact that the State proposed during the negotiations in 1991, 2003, and 2007, to change the eligibility and contribution rates for retiree health insurance from the above language. *See id.*; *see also* Dkt. No. 97-2 at ¶¶ 12, 16-33.

Contrary to Plaintiffs assertions, these provisions do not provide for a vested right to a perpetually fixed premium contribution rate and Mr. Hanna's declaration does not alter this conclusion. Section 9.27(a) simply provides that employees have the right to retain health insurance in retirement upon completion of ten years of service, but is silent as to contribution rates. Section 9.14(a) does not contain any reference to benefits in retirement. As such, while the CBAs guarantee health insurance in retirement to those with ten years of service, they do not guarantee any specific contribution rate in retirement. *See Cup v. Ampco Pittsburgh Corp.*, ___ F.3d ___, 2018 WL 4101049, *3 (3d Cir. 2018) (holding that a provision of a CBA guaranteeing health benefits for "employees" did not apply to former employees who retired before the date that the CBA went into effect).

Additionally, all of the CBAs at issue have durational limits. For example, Article 53 of the 2011-16 CBA provides that "[t]he term of this Agreement shall be from April 2, 2011 to April 1, 2016." Dkt. No. 93-10 at 18. Similarly, the 2007-11 CBA provides that "[t]he term of this Agreement shall be from April 2, 2007 to April 1, 2011." Dkt. No. 93-12 at 29. The sections of this CBAs, and all previous CBAs, providing for health insurance in retirement and setting forth the State's premium contribution rate do not contain any language pertaining to duration. As the Supreme Court has made clear that "'contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement,'" *CNH Indus. N.V.*, 138 S. Ct. at 763 (quotations

omitted), and that "when an agreement does not specify a duration for health care benefits in particular," courts should "simply apply the general durational clause." *Id.* at 766 (citations omitted).

The only reasonable interpretation of the unambiguous language of the CBAs is that the premium contribution rates are subject to the general durational clauses and that this obligation ceased upon the termination of each respective CBA. *See Gallo*, 813 F.3d at 269-70 (quoting *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 207 (1991)); *see also Serafino*, 707 Fed. Appx. at 352-53 ("Looking to the four corners of the agreements, there is no indication that the City intended to provide *any* healthcare benefit to retirees for life, let alone a right to deductible-free, low-co-pay, forever-unalterable healthcare insurance") (emphasis in original). This conclusion is further supported by the legislation passed in 1983 providing that the State would continue to pay the full premium for pre-January 1, 1983 retirees. If retirees had a contractually vested perpetual right to the same contribution rates in effect at the time of their retirement, there would have been no need for an affirmative legislative carve-out specifically applicable to them.

Based on the foregoing, the Court finds that there was no contractual agreement regarding premium contribution rates continuing past the expiration of the CBA. As such, the Court grants Defendants' motion for summary judgment as to Plaintiffs' Contract Clause claim. In an excess of caution, however, the Court will address whether Defendants' actions impaired any such agreement and, if so, whether it was a reasonable and necessary means to serve a legitimate public purpose.

### 3. Substantial Impairment

In their cross motion, Plaintiffs contend the individuals that retired between January 1, 1983 and October 1, 2011, had well-established expectations that this longstanding benefit would

continue as it had for twenty-eight (28) years. *See* Dkt. No. 97-33 at 19-20. Plaintiffs claim that this long-standing practice and the language of the relevant CBAs rendered their expectations reasonable. *See id.*

"'Total destruction' or repudiation of the contract is not necessary for an impairment to be substantial." *Donahue v. Paterson*, 715 F. Supp. 2d 306, 318 (N.D.N.Y. 2010) (quoting *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 26-27 (1977)). "Rather, [the Second] Circuit has stated that 'the primary consideration in determining whether the impairment is substantial is the extent to which reasonable expectations under the contract have been disrupted.'" *Id.* (quoting *Sanitation & Recycling*, 107 F.3d at 993). That is, substantial impairments are those that "go to the heart of the contract," affect [the] terms upon which the parties have reasonably relied," or "significantly alter the duties of the parties." *Id.*

As discussed above, any expectation of a perpetually fixed contribution rate in retirement was unreasonable based on the plain language of the CBAs. The CBAs clearly provide that Plaintiffs would receive the health insurance coverage that was in effect at the time of their retirement. Nothing in the CBAs prevented the State from raising retirees' contribution rates upon the termination of the CBA.

Moreover, even if the Court were to consider the past practices, Defendants are correct that there is no basis for Plaintiffs' assertion that, "since the enactment of Chapter 14 of the Laws of 1983, the State's longstanding practice and established course of conduct further establishes the parties' intent and the State's contractual obligation to provide for the contribution of health insurance benefits for retired State employees, including a continuation of the State contribution rates in effect at the time a State employee retires[.]" Dkt. No. 55 at ¶ 152. The provision in the law guaranteeing that those who retired before January 1, 1983 would pay no contribution was

27

specifically negotiated on an occasion twenty-eight years before this action was commenced. While it is true that, between 1983 and 2011, there was no change in the contribution rate paid by retirees, the State also made no change to the contribution rate paid by employees as well. As such, all that this pattern establishes is that, during the period in question, the need did not arise to make changes to the premium contribution rates.

Based on the foregoing, the Court finds that Defendants are entitled to summary judgment on this claim because the undisputed facts demonstrate that there was no substantial impairment of any contractual right.

### 4. Legitimate Public Purpose That is Reasonable and Necessary

"When a state law constitutes substantial impairment, the state must show a significant and legitimate public purpose behind the law." *Buffalo Teachers Fed'n*, 464 F.3d at 368 (citing *Energy Reserves Group*, 459 U.S. at 411-12, 103 S. Ct. 697; *Sanitation & Recycling Indus.*, 107 F.3d at 993). "A legitimate public purpose is one 'aimed at remedying an important general social or economic problem rather than providing a benefit to special interests.'" *Id.* (quoting *Sanitation & Recycling Indus.*, 107 F.3d at 993). The legitimate public purpose "need not be addressed to an emergency or temporary situation." *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 412 (1983). "[C]ourts have often held that the legislative interest in addressing a fiscal emergency is a legitimate public interest." *Buffalo Teachers Fed'n*, 464 F.3d at 369 (citations omitted).

An impairment is reasonable only if it is "specifically tailored to meet the societal ill it is supposedly designed to ameliorate." *Sanitation & Recycling Indus.*, 107 F.3d at 993 (citing *Allied Structural Steel*, 438 U.S. at 243, 98 S. Ct. at 2721-22). Where the "state's legislation was self-serving to the state, [courts] are less deferential to the state's assessment of reasonableness and

28

necessity than [they] would be in a situation involving purely private contracts[.]" *Buffalo Teachers Fed'n*, 464 F.3d at 370. But "less deference does not imply no deference." *Id.* (citation omitted). "Ultimately, for impairment to be reasonable and necessary under *less deference scrutiny*, it must be shown that the state did not (1) 'consider impairing the ... contracts on par with other policy alternatives' or (2) 'impose a drastic impairment when an evident and more moderate course would serve its purpose equally well,' nor (3) act unreasonably 'in light of the surrounding circumstances[.]'" *Id.* (quoting *U.S. Trust Co.*, 431 U.S. at 30-31, 97 S. Ct. 1505) (emphasis in original).

In the present matter, the Court finds that the undisputed facts demonstrate that Chapter 491 of the Laws of 2011 served a significant and legitimate purpose that was reasonable and necessary. The law was enacted in an effort to close a multi-billion dollar budget gap caused by the Great Recession. *See* Dkt. No. 98 at ¶¶ 54-57. Therefore, it is beyond dispute that the Legislature's public purpose in enacting the law was legitimate. *See Buffalo Teachers Fed'n*, 464 F.3d at 371; *Kirshner v. United States*, 603 F.2d 234, 239 (2d Cir. 1978); *Ambrose v. City of White Plains*, No. 10-cv-4946, 2018 WL 1635498, *19 (S.D.N.Y. Apr. 2, 2018) (holding that the "[f]iscal problems brought on by the so-called Great Recession that began in 2009 have been held" to qualify as a significant and legitimate public purpose) (citing cases); *United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Gov't of the Virgin Islands*, 842 F.3d 201, 211 (3d Cir. 2016) (holding that the government had a legitimate public purpose in implementing salary cuts to unionized workforce in wake of fiscal problems brought on by economic recession in 2009).

Plaintiffs argue that Defendants' claim that increasing the health insurance premiums for individuals that retired between January 1, 1983 and October 1, 2011, was reasonable and

necessary is belied by the record. *See* Dkt. No. 97-33 at 21. "First, according to the State's witness James Dewan, the annual savings to the State to increase the contribution levels for those individuals that retired was between $20 million and $30 million annually. . . . While that is a significant amount of money to a class of individuals on a fixed income, the State's overall budget for the 2011-2012 fiscal year was $131.7 billion. . . . Based on the State's estimated savings, it was at most .023% of the overall $131.7 billion State budget and at the least .015% of the budget, which cannot be truly be [sic] deemed as reasonable and necessary." *Id.* Second, Plaintiffs contend that the State's chief negotiator in 2011, Joseph Bress, testified that there were no written proposals or directives from the Governor's Office regarding how they were to achieve the $450 million in savings. *See id.* Rather, Mr. Bress "was given *carte blanche* to achieve those savings in whatever way he was able to." *Id.* at 21-22. Finally, in an attempt to downplay the financial crisis the State was facing in 2011, Plaintiffs point to the testimony of Priscilla Feinberg, in which she testified that, at every negotiation with the employee unions, Robert Brondi from the Division of Budget made claims that the State "was facing a fiscal crisis and that 2011 was no different than any other year." *Id.* at 22.

First, as set forth in detail above, in the Fiscal Year 2011-12, the State was facing a $10 billion budget gap. Plaintiffs' attempts to downplay the State's dire fiscal situation for Fiscal Year 2011-12 is entirely without merit.

Second, the undisputed facts demonstrate that the action taken by Defendants were narrowly tailored. In Fiscal Years 2009-10, 2010-11, and 2011-12, the State was required to adopt a range of measures to close the large budget gaps and achieve a balanced budget. The measures adopted in these years touched on a range of State activities, including: reductions in State payments for public schools, healthcare providers, local governments, social services and

other services; imposition of cost controls on the operations of State agencies; increases in tax revenues, including personal income taxes, sales taxes, and other taxes; the deferral of required payments to the State pension system; and the use of non-recurring resources. *See* Dkt. No. 98 at ¶ 57. The Fiscal Year 2011-12 gap-closing plan consisted of a range of measures to moderate spending growth and increase receipts. *See id.* at ¶ 59. This plan, which lowered spending by approximately $8.5 billion, included the following reductions: $2.8 billion in education aid; $2.7 billion for Medicaid; $1.5 billion for State agency operations; and $1.6 billion for various other programs and activities. *See id.* at ¶¶ 60-61. The gap-closing plan also included approximately $860 million in actions that the Division of Budget characterized as non-recurring, including the use of certain fund balances and resources made available from state public authorities, as well as $324 million in increased revenues. *See id.* at ¶ 62. These are but a few of the actions that were taken to close the budget gap. In light of the considerable cuts made across all aspects of the State's spending, Plaintiff's argument that the extremely modest percentage increase in contribution rate is not narrowly tailored must be rejected. *See Ambrose*, 2018 WL 1635498, at *21 (finding that an increase in the health insurance contribution rate was reasonable and necessary, especially when considering the many measures taken before enacting the ordinance to address the city's fiscal crisis) (citations omitted); *see also Buffalo Teachers Fed'n*, 464 F.3d at 371 (holding that a wage freeze was reasonable and necessary because the city took "more drastic measures" to alleviate financial stress before turning to freeze).

Additionally, the Court rejects Plaintiffs' argument that the increase in the retirees' health insurance contribution rate was not fiscally motivated. The State was required to identify $450 million in savings from workforce cost reductions. James Dewan indicated that the savings from the administrative extension of the increased contribution rates to retirees were projected to be

$20 to $30 million. *See* Dkt. No. 101-1 at ¶ 6. To achieve the $450 million in workforce cost reductions, other proposals were implemented, including a temporary reduction in employee salary levels and certain changes to health insurance benefits, including increases to prescription drug copayments and deductibles for non-network physician visits. *See id.* at ¶ 7. Additionally, several other proposals were considered but ultimately rejected. Examples of such rejected cost savings proposals include: changing the methodology used to calculate overtime compensation, location pay, and hazardous duty pay; eliminating longevity payments and performance advance increases; reducing workers' compensation benefits; increasing State employees' parking fees; increasing copayments due for certain medical services; increasing the coinsurance paid by enrollees for non-network medical services; changing the methodology used to reimburse claims incurred at non-network hospitals; eliminating Medicare Part B premium reimbursements for newly eligible retirees; and increasing the health insurance premium contributions paid by employees and retirees by one, three, four, five, six, or ten percentage points. *See id.* at ¶ 8. According to Mr. Dewan, these proposals were rejected for various reasons, including that they would fail to yield significant enough savings; they were rejected, or likely would be rejected, by public employee unions; and the availability of other more moderate cost-reduction options. *See id.* at ¶ 9.

The undisputed facts establish that Chapter 491 of the Laws of 2011 and the administrative extension of the premium shift to retirees was a matter of exigency that addressed a societal and economic interest and was appropriately tailored, and that other measures were considered and implemented before this measure was resorted to. Bearing in mind that whether legislation violates the Contracts Clause does not turn on "[w]hether [it] is wise or unwise as a matter of policy," *Home Bldg. & Loan Ass'n*, 290 U.S. at 447-48, a rational factfinder would have

to conclude that Chapter 491 and the administrative extension were reasonable and necessary to address the State's fiscal distress, which was a legitimate public purpose. As such, even if there was a contractual obligation to Plaintiffs, Defendants are still entitled to summary judgment as to the Contract Clause claim.

## C. Second Cause of Action: Breach of Contract[10]

In their second cause of action, Plaintiffs allege that the increase in the percentage of the health insurance premium contribution paid by retirees breached Plaintiffs' contractual rights under the 2007-11 CBA. *See* Dkt. No. 55 at ¶¶ 96-105. Defendants contend that the Court should grant them summary judgment as to this claim because there is no contractual term guaranteeing a perpetual premium contribution rate. *See* Dkt. No. 93-1 at 25.

---

[10] District courts have supplemental jurisdiction over state-law claims that "form part of the same case or controversy" as other claims over which the court has original jurisdiction. 28 U.S.C. § 1367(a). "A court 'may decline to exercise supplemental jurisdiction,' however, if, among other factors, 'the claim raises a novel or complex issue of State law,' or 'the district court has dismissed all claims over which it has original jurisdiction.'" *Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 102 (2d Cir. 2014) (quoting 28 U.S.C. § 1367(c)). "Courts must consider 'the values of judicial economy, convenience, fairness, and comity' when deciding whether to exercise supplemental jurisdiction." *Id.* (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988)).

In the present matter, considering the advanced stage of the litigation and the Court's familiarity with the issues in this case, combined with the likely hardship to both parties should Plaintiffs re-file in state court, the factors clearly weigh in favor of exercising supplemental jurisdiction. *See id.* The hardship to the parties would be further compounded by the fact that there are eleven cases related to the present matter that have all been through the same extensive litigation. Additionally, considering that most of Plaintiffs' state law claims are effectively resolved through the Court's disposition of the federal claims, exercising supplemental jurisdiction in the present matter is particularly appropriate. *See Fletcher v. ABM Building Value*, No. 14 Civ. 4712, 2018 WL 1801310, *24 (S.D.N.Y. Mar. 28, 2018) (exercising supplemental jurisdiction over state law claims that were "effectively resolved" through the dismissal of similar federal claims but declining to exercise supplemental jurisdiction over state claims that involved application of different standards). Finally, the Court notes that Plaintiffs specifically request that the Court exercise supplemental jurisdiction in the event that the Court grants Defendants' motion for summary judgment as to the federal causes of action.

"The essential elements of a breach of contract cause of action are 'the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach.'" *Canzona v. Atanasio*, 118 A.D.3d 837, 838-39 (2d Dep't 2014) (quotation and other citations omitted). "Generally, a party alleging a breach of contract must 'demonstrate the existence of a . . . contract reflecting the terms and conditions of their . . . purported agreement.'" *Id.* at 839 (quotations omitted). "Moreover, 'the plaintiff's allegations must identify the provisions of the contract that were breached.'" *Id.* (quotation and other citation omitted).

In the present matter, in dismissing Plaintiffs' Contracts Clause cause of action, the Court held that there was no impairment of contract, *i.e.*, that the CBAs at issue did not promise Plaintiffs a perpetual premium contribution rate. It necessarily follows that Defendants did not breach this nonexistent contract term.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiffs' second cause of action.

**D.    Third and Fifth Causes of Action: Due Process**

The third and fifth causes of action allege that the retirees' premium contribution increase violated Plaintiffs' right to due process under the Federal and State Constitutions. *See* Dkt. No. 55 at ¶¶ 106-15, 132-40. Defendants argue that these claims fail because Plaintiffs do not have a property interest in a perpetually fixed premium contribution rate and the New York State Constitution does not provide for the cause of action Plaintiffs assert. *See* Dkt. No. 93-1 at 26-29, 32-34. Additionally, Defendants contend that, even if Plaintiffs had a property interest, the claim still fails because they had an adequate state-court remedy of which they failed to avail themselves. *See id.* at 30-32.

The Fourteenth Amendment provides, in relevant part, that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In order to demonstrate a violation of either substantive or procedural due process rights, the plaintiff must first demonstrate the possession of a federally protected property right to the relief sought. *See Puckett v. City of Glen Cove*, 631 F. Supp. 2d 226, 236 (E.D.N.Y. 2009) (citing *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 16 (2d Cir. 1999)). Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 577 (1972) (holding that the plaintiff must have more than a unilateral expectation; the plaintiff must have a legitimate claim of entitlement to the benefit). The Second Circuit has held that, "[i]n order for a person to have a property interest in a benefit such as the right to payment under a contract, [h]e must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Local 342, Long Island Pub. Serv. Emp., UMD, ILA, AFLCIO v. Town Bd. of the Town of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994) (citations omitted). "When determining whether a plaintiff has a claim of entitlement, we focus on the applicable statute, contract or regulation that purports to establish the benefit." *Martz v. Vill. of Valley Stream*, 22 F.3d 26, 30 (2d Cir.1994).

"Courts have determined that in appropriate circumstances, contractual rights arising from collective bargaining agreement give rise to constitutional property right." *Jackson v. Roslyn Bd. of Educ.*, 652 F. Supp. 2d 332, 341 (E.D.N.Y. 2009) (citing *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 314 (2d Cir. 2002). A "property interest in employment can be created by ordinance or state law." *Winston v. City of New York*, 759 F.2d 242, 247 (2d Cir. 1985) (holding that the

plaintiffs' benefits were found in the New York State Constitution and vested in the plaintiffs by the terms of a statutory scheme). The Second Circuit has held that, "[i]n determining whether a given benefits regime creates a property interest protected by the Due Process Clause, we look to the statutes and regulations governing the distribution of benefits." *Kapps v. Wing*, 404 F.3d 105, 113 (2d Cir. 2005) (citation omitted). "Where those statutes or regulations meaningfully channel official discretion by mandating a defined administrative outcome, a property interest will be found to exist." *Id.* (citation omitted). Courts in this circuit have held that statutory framework may create a property interest. *See Kapps*, 404 F.3d at 104; *see also Basciano v. Herkimer*, 605 F.2d 605 (2d Cir. 1978) (holding that the city administrative code created a property right in receipt of accident disability retirement benefits, where the code required officials to give benefits to applicants who met specified criteria); *see also Winston*, 759 F.2d at 242; *Sparveri v. Town of Rocky Hill*, 396 F. Supp. 2d 214, 218 (D. Conn. 2005) (noting that the plaintiff claimed that her entitlement to the level of pension and healthcare benefits was rooted in the statutory pension scheme established by the Town Charter and Plan ordinance).

"The Due Process Clause does not protect against all deprivations of constitutionally protected interests in life, liberty, or property, 'only against deprivations without due process of law.'" *Rivera-Powell v. New York City Bd. of Elections*, 470 F.3d 458, 464-65 (2d Cir. 2006) (quoting *Parratt v. Taylor*, 451 U.S. 527, 537, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981) (internal quotation marks omitted), *overruled in part on other grounds by Daniels v. Williams*, 474 U.S. 327, 330-31, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986)). "The commonsense principle at the heart of the due process guarantees in the United States and New York Constitutions is that when the State seeks to take life, liberty or property from an individual, the State must provide effective procedures that guard against an erroneous deprivation." *People v. David W.*, 95 N.Y.2d 130, 136

(2000) (citing U.S. Const., Amend. XIV, § 1; N.Y. Const., art. I, § 6; *Mathews v. Eldridge*, 424 U.S. 319, 334-335, 96 S. Ct. 893, 47 L. Ed. 2d 18; *Wisconsin v. Constantineau*, 400 U.S. 433, 436, 91 S. Ct. 507, 27 L. Ed. 2d 515).  A state may satisfy due process with either pre-deprivation remedies or post-deprivation remedies.  *See Rivera-Powell*, 470 F.3d at 465 (citation omitted).

In the present matter, the Court finds that Defendants are entitled to summary judgment as to Plaintiffs' due process claims because Plaintiffs had an adequate state court remedy available to them.  Through the passage of the amendments to section 167(8) of the Civil Service Law and the Resolution passed by Defendant Hite amending section 73.3(b) of Title 4 of the New York Code of Rules and Regulations, Plaintiffs had notice of the changes to their health insurance contribution rates about to take effect.  *See* Dkt. No. 93-2 at ¶ 47 (citing Dkt. No. 93-21).  It is well settled that an Article 78 proceeding generally provides constitutionally adequate post-deprivation process.  *See Campo v. N.Y.C. Emps. Ret. Sys.*, 843 F.2d 96, 102 (2d Cir. 1988); *Minima v. N.Y.C. Emps. Ret. Sys.*, No. 11-cv-2191, 2012 WL 4049822, *6 (E.D.N.Y. Aug. 17, 2012).[11]

Even assuming that the availability of an Article 78 proceeding did not preclude Plaintiffs' due process claims, they are nevertheless still subject to dismissal.  While it is true that collective bargaining agreements can be the source of a property right entitled to due process protection, "not every contractual benefit rises to the level of a constitutionally protected property interest." *Ezekwo v. N.Y.C. Health & Hosps. Corp.*, 940 F.2d 775, 782 (2d Cir. 1991).  It has been observed that "when federal courts find that a CBA or other nonstatutory source has created a protectable property interest, 'typically it is because the CBA, or the employer's explicitly stated policies,

---

[11] The Court notes that Plaintiffs' response did not address Defendants' argument that their due process claim is precluded because of the availability of constitutionally adequate post-deprivation process through an Article 78 proceeding.  *See* Dkt. No. 97-33 at 28-30.

virtually guaranteed that the employee would enjoy some particular, significant benefit, or that the employee would not be disciplined without cause.'" *Dohrmann-Gallik v. Lakeland Cent. Sch. Dist.*, No. 14-cv-4397, 2015 WL 4557373, *3 (S.D.N.Y. July 27, 2015) (quoting *MacFall v. City of Rochester*, 746 F. Supp. 2d 474, 483 (W.D.N.Y. 2010), *aff'd*, 495 Fed. Appx. 158 (2d Cir. 2012)). "Generally, the types of contractual benefits that are protected by the Due Process Clause are those bearing a quality or character of 'extreme dependence,' as in the case of welfare benefits, or 'permanence,' as in the case of loss of public employment." *Id.* (citing *S & D Maint. Co. v. Goldin*, 844 F.2d 962, 966 (2d Cir. 1988); *Danese*, 827 F. Supp. at 191-92).

Here, as discussed above, Plaintiffs have failed to identify a term in any of the CBAs guaranteeing premium contributions at a fixed rate in perpetuity. In their response to Defendants' motion, Plaintiffs also appear to argue that, in addition to the rights created by the CBAs themselves, there was a "mutually explicit understanding" between the parties that created their protected interest in premium contribution rates that would remain fixed in retirement. *See* Dkt. No. 97-3 at 28-29. As Defendants correctly argue, the cases cited by Plaintiffs do not support their claim.

In *Perry v. Sinderman*, 408 U.S. 593 (1972), the Court held that the plaintiff college professor had a property interest in continued employment in the absence of tenure where by reason of rules and understandings promulgated and fostered by state officials, the college had a *de facto* tenure program and the professor had tenure under that program. *See id.* at 600-02. Here, unlike *Perry*, Plaintiffs have failed to cite to anything other than their own subjective belief, primarily based on the testimony of Mr. Hanna, that they had a right to fixed premium contribution rates in retirement. *Perry* made clear, however, that a mere "subjective 'expectancy'" is not protected by procedural due process. *See Perry*, 408 U.S. at 603.

In *Barnes v. Zaccari*, 669 F.3d 1295 (11th Cir. 2012), the court found that the plaintiff had an interest in continued enrollment in a university that was based on express language in the school board's policy manual and the student code of conduct that provided that a student could not be disciplined until being found guilty of a violation of the code of conduct. *See id.* at 1304. Again, unlike the present matter, *Barnes* involved express language guaranteeing certain rights and protections. No such language exists in the present matter.

In *Basciano v. Herkimer*, 605 F.2d 605 (2d Cir. 1978), a laborer employed by the city applied for accident disability retirement after suffering an injury on the job. *See id.* at 606. The plaintiff's application was denied. *See id.* at 606-07. The Second Circuit concluded that the mandatory language of New York City Administrative Code, which required that the City grant accident disability retirement benefits to those who meet certain criteria, created a property interest protected by the Due Process Clause. *See id.* at 609.

The Second Circuit distinguished *Basciano* in *Costello v. Town of Fairfield*, 811 F.2d 782 (2d Cir.1987). In *Costello*, the plaintiffs' collective bargaining agreement provided for a salary increase of 4.5% at year-end. *See id.* The plaintiffs, however, retired before the increase went into effect, and demanded that the town apply the 4.5% increase to their retirement pay at year-end. *See id.* When the town refused, the plaintiffs filed a section 1983 claim. *See id.* At summary judgment, the district court dismissed the claim and the Second Circuit affirmed, reasoning that the contractual increase in retirement pay was not a protected property interest. *See id.* at 784. The Second Circuit explained that *Basciano* was not controlling because it involved the denial of all disability retirement benefits, as opposed to merely an increase in benefits. *See id.* The Second Circuit further explained that the section 1983 claim was really a contract claim in disguise because the court would have had to interpret the CBA's terms to

resolve whether the claimed increase was due in order to decide whether there was an "entitlement" to the increase.  *See id.*

Here, as in *Costello*, Plaintiffs have not suffered a complete loss of benefits.  And, unlike *Basciano*, Plaintiffs have failed to cite to any relevant statute, regulation, or otherwise official promulgation that would support their claim of a mutually explicit understanding.  Additionally, courts have been reluctant to find a property interest premised on a benefit conferred by a public contract unless that benefit has been denied entirely.  *See Jackson v. Roslyn Bd. of Educ.*, 652 F. Supp. 2d 332, 341-43 (E.D.N.Y. 2009); *Lawrence v. Town of Irondequoit*, 246 F. Supp. 2d 150, 156-57 (W.D.N.Y. 2002).

Based on the foregoing, the Court finds that Defendants are entitled to summary judgment as to Plaintiffs' due process causes of action.

**E.      Fourth Cause of Action: Violation of State Law**

Plaintiffs' fourth cause of action alleges that Defendant Hite lacked the authority to administratively extend the premium shift.  *See* Dkt. No. 55 at ¶¶ 116-31.  Defendants claim that this cause of action "appears to have been brought pursuant to Article 78 of the New York Civil Practice Law and Rules and has been dismissed."  Dkt. No. 93-1 at 9 (citing Dkt. No. 19 at 19-22).  Plaintiffs have not responded to Defendants' motion insofar as it seeks dismissal of the fourth cause of action.

Having failed to address Defendants' motion as to this claim, the Court finds that Plaintiffs have abandoned this claim.  *See Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (noting that a counseled response to a motion for summary judgment that makes some – but not all – arguments available generally "reflects a decision by [the] party's attorney to pursue some claims or defenses and to abandon others"); *see also Howard v. City of New York*, 62 F. Supp. 3d 312,

324 (S.D.N.Y. 2014) (citation omitted).  Moreover, as Defendants correctly contend, the Court

previously dismissed an identical claim that was brought in Plaintiffs' original complaint.  *See*

Dkt. No. 19 at 19-22.  As such, even if Plaintiffs had not abandoned this claim, summary

judgment would be appropriate for the reasons previously set forth by the Court.  *See id.*

**F.**     **Sixth Cause of Action: Violation of Article III, § 1 of New York State Constitution**

In their sixth cause of action, Plaintiffs allege that Defendants Hite and Megna violated

Article III, § 1 of the New York State Constitution when they extended the premium contribution

changes to retirees pursuant to the authority granted in section 167(8) of the Civil Service Law.

*See* Dkt. No. 55 at ¶¶ 141-45.  Defendants argue that the Court should decline to exercise over

this state law claim which, in any event, has no merit because Defendants Hite and Megna acted

in accordance with the express terms of section167(8).  *See* Dkt. No. 93-1 at 34-35.

Article III, § 1 of the New York State Constitution states that "[t]he legislative power of

this state shall be vested in the senate and assembly."  ""The concept of the separation of powers is

the bedrock of the system of government adopted by this State in establishing three coordinate

and coequal branches of government, each charged with performing particular functions.'"

*Garcia v. N.Y.C. Dep't of Health & Mental Hyg.*, ___ N.Y.3d___, 2018 WL 3147611, *3 (2018)

(quotations omitted).  "This principle, 'implied by the separate grants of power to each of the

coordinate branches of government, requires that the Legislature make the critical policy

decisions, while the executive branch's responsibility is to implement those policies.'"  *Id.*

(quotation and other citation omitted).

Section 167(8) of the Civil Service Law provides as follows:

> Notwithstanding any inconsistent provision of law, where and to the
> extent that an agreement between the state and an employee
> organization entered into pursuant to article fourteen of this chapter
> so provides, the state cost of premium or subscription charges for

41

> eligible employees covered by such agreement may be modified
> pursuant to the terms of such agreement. The president, with the
> approval of the director of the budget, may extend the modified
> state cost of premium or subscription charges for employees or
> retirees not subject to an agreement referenced above and shall
> promulgate the necessary rules or regulations to implement this
> provision.

N.Y. Civ. Serv. Law § 167(8). Defendants Hite and Megna cited to this provision in extending the increase in health insurance contribution rates to retirees.

Plaintiffs first contend that Defendants' motion for summary judgment must be denied because, at the time the State changed the cost of retiree contribution rates, effective October 1, 2011, Defendant Hite was serving as the Director of Division of Classification and Compensation and the Deputy Commissioner for the Department of Civil Service. *See* Dkt. No. 97-33 at 32. Plaintiffs argue that, "[i]n order to modify the civil service law to include modification to retiree health insurance, as set forth in Defendant Hite's correspondence to Defendant Megna, dated September 21, 2011, these individuals were required to have been serving in a legislative capacity, which they were not." *Id.* Further, Plaintiffs assert that, even if the Court were to look to "Civil Service Law § 167(8) for Defendants Hite's and Megna's authority to increase the retiree health insurance contributions in 2011, these individuals still lacked the appropriate ability to authorize changes to the retiree contribution rates." *Id.* Plaintiffs argue that, in September 2011, the position of President of the Civil Service Commission was vacant and that, at that time, Defendant Hite had not filed an oath of office as Commissioner of the Department of Civil Service or as President of the Civil Service Commission. *See id.* As such, Plaintiffs argue that Defendant Hite lacked the authority under Civil Service Law § 167(8) to extend the modified health insurance contribution rates to retired employees. *See id.* at 32-33.

To the extent that Plaintiffs are attempting to argue that section 167(8) is an

unconstitutional delegation of legislative authority, their argument is unpersuasive.  In *Retired*

*Public Employees Assoc., Inc. v. Cuomo*, 123 A.D.3d 92 (3d Dep't 2014), the plaintiffs argued

that Civil Service Law § 167(8) constituted an unconstitutional delegation of legislative authority.

*See id.* at 97.  Rejecting this argument, the Third Department held that

> the power given to the Civil Service Commission, with the approval
> of the Budget Director, to modify health insurance contribution
> rates for retirees and non-represented state employees is entirely
> dependent upon – and limited by the terms of – a negotiated
> agreement between the state and an employee organization
> modifying the contribution rates for current employees. . . .
> Contrary to petitioners' contention, the standard set forth by the
> Legislature – that any change in the retiree statutory contribution
> rate must be tied to a collectively bargained rate – provides
> adequate guidance for the exercise of that discretion, as "there need
> not be a specific and detailed legislative expression authorizing a
> particular executive act [where, as here,] the basic policy decisions
> underlying the [actions authorized] have been made and articulated
> by the Legislature."

*Id.* at 97-98 (quotation and other citation omitted).  The Third Department also rejected the

plaintiffs' claim that section 167 was internally inconsistent to the extent that section 167(1)(a)

imposes a fixed contribution rate for retiree health insurance.  *See id.* at 95.  The court held that,

considering the statute as a whole, section 167(8) plainly and unambiguously permits

modification of the fixed contribution rates for health insurance premiums set forth in Civil

Service Law § 167(1)(a).  *See id.*  The court noted that section 167(8) "begins with the phrase

'[n]otwithstanding any inconsistent provision of law,' which is a 'verbal formulation frequently

employed for legislative directives intended to preempt any other potentially conflicting statute,

wherever found in the [s]tate's laws.'"  *Id.* (quotation and other citation omitted).  "Thus, while

Civil Service Law § 167(1)(a) provides for a fixed percentage contribution, the explicit command

43

of the Legislature in Civil Service Law § 167(8) makes clear that the former provision does not apply where it would otherwise conflict with Civil Service Law § 167(8)." *Id.*

Next, the Court finds unpersuasive Plaintiffs' argument that Defendant Hite was not authorized to increase the premium contribution rate for retirees pursuant to section 167(8) because she had not filed an oath of office as President of the Civil Service Commission or Commissioner of the Department of Civil Service. Section 9 of the New York State Public Officers Law provides in relevant part as follows:

> If there is but one deputy, he shall, unless otherwise prescribed by law, possess the powers and perform the duties of his principal during the absence or inability to act of his principal, or during a vacancy in his principal's office. If there be two or more deputies of the same officer, such officer may designate, in writing, the order in which the deputies shall act, in case of his absence from the office or his inability to act, or in case of a vacancy in the office, and if he shall fail to make such designation, the deputy longest in office present shall so act.

N.Y. Pub. Off. Law § 9. Immediately prior to her resignation as Commissioner of the Department of Civil Service, Nancy Groenwegen filed a form entitled "Designation of Deputy" that designated Patricia Hite to possess the Commissioner's powers and perform the Commissioner's duties during the vacancy in the Commissioner's office. *See* Dkt. No. 97-22 at 2. On that same date, Defendant Hite submitted a form entitled "Public Officer Oath/Affirmation" that was filed with the Department of State as required. *See id.* at 3. Upon Nancy Groenwegen's resignation, Defendant Hite was authorized to perform the duties of the Commissioner of the Department of Civil Service and President of the Civil Service Commission until her replacement was appointed by the Governor. *See* N.Y. Pub. Off. Law § 9; N.Y. Civ. Serv. Law §§ 5, 7; *see also* Office of the Attorney General, Formal Opinion No. 250 dated Oct. 15, 1941, 1941 WL 52436 (1941) (finding that, upon a vacancy in the Office of State Comptroller, pending an appointment of a temporary

Comptroller, the duties of the office may be performed by a deputy qualifying under section 9 of the Public Officers Law).

Plaintiffs have provided only conclusory allegations in support of their opposition to Defendants' motion, which the Court finds unpersuasive. Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiffs' sixth cause of action.

**G.      Seventh Cause of Action: Civil Rights Violation Under 42 U.S.C. § 1983**

The seventh cause of action purports to be a separate cause of action under 42 U.S.C. § 1983. *See* Dkt. No. 55 at ¶¶ 146-49. Defendants contend that this claim is duplicative of the Contracts Clause and federal Due Process causes of action and must be dismissed. *See* Dkt. No. 93-1 at 36. In response, Plaintiffs argue that they "have established continued health insurance premium contributions at the fixed rate of 10% for individual coverage and 25% for dependent coverage. Defendants acting in their official capacity impaired the contracts at issue in violation of Article I, § 10 of the United States Constitution." Dkt. No. 97-33 at 30. As such, Plaintiffs claim that they are entitled to summary judgment on their seventh cause of action. *See id.*

Having already found that Defendants are entitled to summary judgment on Plaintiffs' federal claim and because 42 U.S.C. § 1983 is but a procedural mechanism that itself creates no substantive rights, the Court grants Defendants' motion for summary judgment as to Plaintiffs' seventh cause of action.

**H.      Eighth Cause of Action: Contract Rights Established by Statute and Practice**

In the eighth cause of action, Plaintiffs allege that the retirees' premium contribution increase violated Plaintiffs' contract rights established by statute and longstanding practice. *See* Dkt. No. 55 at ¶¶ 150-55. Defendants argue that they are entitled to summary judgment as to this claim because (1) it is well established that Civil Service Law § 167(1) did not bestow any

contractual rights on Plaintiffs; (2) the claimed past practice did not exist; and (3) a past practice is merely a form of parol evidence and does not independently establish a contractual right. *See* Dkt. No. 93-1 at 37-39. In response, Plaintiffs contend that the 1983 amendment to the Civil Service Law concerning retiree health insurance was an extension of the parties' negotiations and collective bargaining agreements. *See* Dkt. No. 97-33 at 33. In its filings, Defendants assert that "'[t]he 1983 law was enacted to implement agreements reached through collectively bargaining, including an express agreement that the State would continue to pay 100% of the health insurance premium contributions for those who retired prior to January 1, 1983.'" *Id.* Plaintiffs argue that "[c]learly, such an assertion establishes that the changes to health contribution rates for employees retiring on or after January 1, 1983, was negotiated between the parties." *Id.* Additionally, according to Ross Hanna, the parties never negotiated any further changes to retiree health insurance contribution rates. *See id.* Plaintiffs also claim that the past practice of the parties demonstrates the intent of providing retiree health insurance at the contribution rates memorialized in the 1983 civil service statute. *See id.* at 34. "Despite the State's proposals in 2003 and 2007 to change the retiree health insurance contribution rates based on a sliding scale, the parties never agreed to modify such rates from those negotiated between the parties and made effective on January 1, 1983." *Id.*

As Defendants correctly note, courts are hesitant to read contractual rights into statutes because to do so would too easily preclude the State from changing its policies:

> [A]bsent some clear indication that the legislature intends to bind itself contractually, the presumption is that "a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise" ... Policies, unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body.

46

*National R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 466 (1985)

(quoting *Dodge v. Board of Educ.*, 302 U.S. 74, 79, 58 S. Ct. 98, 82 L. Ed. 57 (1937)). The New

York Court of Appeals has explained that "certain types of legislative acts, including those fixing

salaries and compensation ... are not presumed to create a contract." *Cook v. Binghamton*, 48

N.Y.2d 323, 330 (1979).

In *Retired Public Employees Assoc., Inc. v. Cuomo*, 123 A.D.3d 92 (3d Dep't 2014), the

Third Department specifically rejected these very arguments. The court found "nothing in the

language of Civil Service Law § 167(1)(a) to constitute 'clear and irresistible evidence' that the

Legislature intended to 'fetter[ ] its power in the future' with respect to retirees' health insurance

contributions." *Id.* at 96-97 (quotation and other citation omitted). Significantly, the court noted

that "the statute does not contain any 'words of contract' or employ any terms that signal an intent

to create a contractual or vested right." *Id.* at 97 (quotation and other citations omitted). Under

these circumstances, the court held that "Civil Service Law § 167(1)(a) is more reasonably read as

a policy determination regarding the state's contribution rate towards retiree health insurance

premiums that is subject to later change at the will of the Legislature." *Id.* (citations omitted).

Contrary to Plaintiffs' arguments, the Court finds that Civil Service Law § 167(1) did

nothing more that set forth policy and did not create vested contractual rights. Its terms do not

"clearly and unequivocally" express an immutable contractual guarantee. Indeed, all courts to

have considered this argument have rejected it. *See Retired Public Emps. Assoc., Inc.*, 123

A.D.3d at 96-97; *New York State Court Officers Assoc. v. Hite*, 851 F. Supp. 2d 575, 582

(S.D.N.Y. 2012) ("Indeed, section 167(8) – both before and after its amendment by Chapter 491 –

anticipates that its terms may be altered through negotiation. Reading section 167 as a contract

would improperly impair the ability of the Legislature to change its policies regarding its employees health insurance plans"), *aff'd*, 475 Fed. Appx. 803 (2d Cir. 2012).

Moreover, the alleged "past practice" of providing higher contribution rates prior to 2011 does not change this conclusion. "Courts also may look to the past practice of the parties to give definition and meaning to language in an agreement, including a collective bargaining agreement, which is ambiguous." *Aeneas McDonald Police Benev. Assoc. v. City of Geneva*, 92 N.Y.2d 326, 333 (1998) (citations omitted). "However, past practice, like any other form of parol evidence, is merely an interpretive tool and cannot be used to create a contractual right independent of some express source in the underlying agreement." *Id.* (citations omitted).

First, as discussed above, while it is true that, between 1983 and 2011, there was no change in the contribution rate paid by retirees, the State also made no change to the contribution rate paid by employees as well. As such, all that this pattern establishes is that, during the period in question, the need did not arise to make changes to the premium contribution rates and that individuals who retired after January 1, 1983 paid the same contribution rate as current employees. Second, even if applying the same contribution rates to retirees as to active employees constitutes a past practice, it cannot, as Plaintiffs claim, independently establish a contractual right. *See Aeneas McDonald Police Benev. Assoc.*, 92 N.Y.2d at 333.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiffs' eighth cause of action.

## I. Plaintiffs' Motion to Preclude the Declarations of Colafati and Decker

### 1. Standard

Federal Rule 26 requires parties to disclose the identity of individuals "likely to have discoverable information …that the disclosing party may use to support its claims or defense."

Fed. R. Civ. P. 26(a). Parties are also required to update and supplement their disclosures and other discovery responses in "a timely manner." Fed. R. Civ. P. 26(e). Additionally, Rule 26(a)(2)(A) requires a party to disclose "the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2)(A). Indeed, "the identity of any witness who may be used to provide expert testimony, whether specifically retained for that purpose or not, must be disclosed." *DVL, Inc. v. General Electric Co.*, 811 F. Supp. 2d 579, 588 (N.D.N.Y. 2010) (citing *Lamere v. New York State Office for the Aging*, No. 03-CV-0356, 2004 WL 1592669, *1 (N.D.N.Y. July 14, 2004)). In addition, Rule 26(a)(2)(B) requires the additional disclosure of "a written report — prepared and signed by the witness — if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B). Disclosures made pursuant to Rule 26(a)(2) must be provided "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D); *see also DVL, Inc.*, 811 F. Supp. 2d at 588 (citation omitted). "The purpose of Rule 26(a)(1)(A) is to 'alert an opposing party of the need to take discovery of the named witness.'" *Harris v. Donohue*, No. 1:15-cv-1274, 2017 WL 3638452, *2 (N.D.N.Y. Aug. 23, 2017) (citing *Badolato v. Long Island R.R.*, No. 14-cv-1528, 2016 WL 6236311, at *4 (E.D.N.Y. Oct. 25, 2016)).

If a party fails to disclose a witness under Federal Rule of Civil Procedure 26(a) or (e), a party may not use that witness unless the failure to disclose was substantially justified or harmless. *See* Fed. R. Civ. P. 37(c)(1). "In determining whether preclusion is appropriate, courts must consider: (1) the reasons for the delay in providing the evidence; (2) the importance of the evidence precluded; (3) the prejudice to the opposing party from having to address the new evidence; and (4) the possibility of a continuance." *In re Bear Stearns Companies, Inc. Sec.,*

*Derivative, & ERISA Litig.*, No. 09 Civ. 8161, 2017 WL 2839638, *5 (S.D.N.Y. June 30, 2017)

(citing *Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997);

*Outley v. City of New York*, 837 F.2d 587, 590-91 (2d Cir. 1988)); *see also Patterson v.*

*Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (same).

### 2. Declaration of Dominic Colafati

In their motion, Plaintiffs note that, "[c]ontained within Mr. Colafati's Declaration is data

and analysis concerning New York State's finances during all times relevant in this action

allegedly based on records maintained by the DOB in the regular course of its business which

have not been identified or disclosed to Plaintiffs, including quoted reports from 'Standards and

Poor's', 'Fitch Ratings' and 'Moody's Investors Service.'"  Dkt. No. 97-33 at 37.  Mr. Colafati

states further that he was responsible for all aspects of the Division of Budget's Expenditure Debt

Unit's operations, which included overseeing the State's Financial Plan.  *See id.*  Plaintiffs argue

that, "[a]lthough he indicates that his employment at DOB may have exposed him to aspects of

the State's finances and the processes of developing the annual budget, a review of Mr. Colafati's

Declaration reveals that the Defendants are attempting to use Mr. Colafati's expertise and analysis

of the DOB financial records and documents, rather than as a fact witness based upon his own

personal observations and experiences." *Id.*  Plaintiffs contend that Defendants' motion papers

make clear that Mr. Colafati's testimony is being used to demonstrate that Defendants had a

"legitimate public purpose" to excuse their unconstitutional impairment of Plaintiffs' contract

rights.  *See id.* at 37-38.  Plaintiffs assert that this declaration must be stricken because

Defendants failed to disclose Mr. Colafati as an expert pursuant to Rule 26.  *See id.*  Further,

Plaintiffs contend that, should the Court deem this lay testimony, it should still be precluded

because Defendants failed to disclose him as a witness and Plaintiffs would be prejudiced because they were not permitted to depose him. *See id.* at 39.

Having considered the parties' submissions and the applicable law, the Court denies Plaintiffs' motion to preclude the declaration of Mr. Colafati. Initially, the Court notes that, in their statement of material facts, Defendants relied on Mr. Colafati's declaration in discussing the fiscal crisis facing the State in 2010-2011. *See* Dkt. No. 98 at ¶¶ 54-77. In their response to Defendants' statement of material facts, Plaintiffs admit to every fact established through Mr. Colafati's declaration. *See id.*

Next, the Court finds that Mr. Colafati's declaration does not constitute expert testimony. Rather, Mr. Colafati simply set forth institutional facts (many of which were publically known), not facts that were personal to him. Mr. Colafati's testimony is rationally based on his experience working for the Division of Budget and is not based on specialized knowledge.

Finally, the Court finds that Plaintiffs did not suffer prejudice from Defendants failure to disclose Mr. Colafati. All of the information contained in Mr. Colafati's declaration is contained in the declaration of James DeWan, who was listed in Defendants' Rule 26 disclosure and whom Plaintiffs did depose. *See* Dkt. No. 97-18; Dkt. No. 97-12 at 3.

Accordingly, the Court denies Plaintiffs' motion to preclude the declaration of Dominic Colafati.[12]

### 3. *Declaration of Darryl Decker*

---

[12] Even if the Court granted Plaintiffs' motion to preclude Mr. Colafati's declaration, Defendants would still be entitled to summary judgment as to all claims because Mr. Colafati's declaration was only relevant in determining whether Defendants had a legitimate public interest in impairing the alleged contract.

Darryl Decker has been employed by the New York State Governor's Office of Employee Relations ("GOER") since 1996. *See* Dkt. No. 91-4 at ¶ 1. According to Plaintiffs, "[b]ased on his positions and his role as the 'lead health benefits negotiator for several CBAs' since 1999, Mr. Decker testifies to the meaning of certain language contained in the Health Insurance Articles of the collective bargaining agreements made between the State and Council 82 going back to as far as the 1982 to 1985 collective bargaining agreement, long before his employment commenced." Dkt. No. 97-33 at 40. Plaintiffs contend that the Court should strike Mr. Decker's declaration due to the prejudice caused by Defendants' Rule 26 violation. *See id.*

Having considered Plaintiffs' arguments, the Court denies the motion to preclude the declaration of Darryl Decker. The information contained in Mr. Decker's declaration is also available through the declaration of Priscilla Feinberg, Mr. Decker's predecessor. *See* Dkt. No. 93-5. Since Plaintiffs were given the opportunity to depose Ms. Feinberg, Plaintiffs have failed to demonstrate that they suffered any prejudice from Defendants' Rule 26 violation.

Based on the foregoing, the Court denies Plaintiffs' motion to preclude the declaration of Darryl Decker.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 93) is **GRANTED**; and the Court further

**ORDERS** that Plaintiffs' cross motion for summary judgment (Dkt. No. 97) is **DENIED**; and the Court further

**ORDERS** that Plaintiffs' motion to preclude the declarations of Dominic Colafati and Darryl Decker is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance in the Local Rules.

**IT IS SO ORDERED.**

Dated: September 24, 2018
      Albany, New York

Mae A. D'Agostino
U.S. District Judge